**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

FILED

2019 JUL 18 PM 3: 18

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

No. ___:19-CV-_____

**EP19CV01.95**

**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF**

(FILED UNDER SEAL)

Federal Trade Commission, and

State of Ohio ex rel. Attorney General Dave Yost,

          Plaintiffs,

v.

Madera Merchant Services, LLC, also dba E Check Processing and echeckprocessing.net, a Texas company,

B&P Enterprises, LLC, a Texas company,

Bruce C. Woods, individually and as an owner, officer, member, and/or manager of Madera Merchant Services, LLC, and B&P Enterprises, LLC,

Patricia Woods, individually and as an owner, manager, and/or member of Madera Merchant Services, LLC, and B&P Enterprises, LLC,

and

Victor Rodriguez, individually and as an officer, member, and/or manager of Madera Merchant Services, LLC, and B&P Enterprises, LLC,

          Defendants.

Plaintiffs, the Federal Trade Commission ("FTC") and the State of Ohio, for their Complaint allege:

1.     The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission

or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, the appointment of a receiver, an asset freeze, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

2.      The State of Ohio, by and through its Attorney General, Dave Yost, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6103, and the Ohio Consumer Sales Practices Act ("CSPA"), O.R.C. 1345.07 in order to obtain, temporary, preliminary, and permanent injunctive relief, consumer damages, and other equitable relief for Defendants' acts or practices in violation of the Ohio CSPA, O.R.C. 1345.01 *et seq.*, and the TSR, 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1367.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (b)(3), and (c), and 15 U.S.C. § 53(b).

## SUMMARY OF THE CASE

5.      For more than a decade, Defendants have been running a third party payment processing scheme that uses remotely created payment orders or remotely created checks ("RCPOs") to withdraw money from consumers' accounts on behalf of third-party merchants. An RCPO is a payment instruction or order drawn on a person's account that is created by the payee or the payee's agent and deposited into or cleared through the check clearing system. RCPOs do not bear the signature of the payor. A remotely created check is a type of RCPO.

6.     Defendants routinely withdraw funds from consumers for perpetrators of fraud and deceptive schemes, including various telemarketing schemes.

7.     Concurrently with the filing of this action, the FTC is filing, in this district, a suit against one of Defendants' largest merchant-clients – a credit card interest-reduction telemarketing scheme known as Educare Center Services ("Educare") based out of Canada and the Dominican Republic. Defendants have withdrawn at least $11.5 million from American consumers on behalf of Educare.

8.     To execute their payment processing scheme, Defendants open business checking accounts under various assumed names with banks and credit unions, the majority of which are local institutions. Defendants often misrepresent to the financial institution the type of business for which they open the account, and routinely fail to disclose the real reason for which they open the account – processing consumer payments for third-party merchants via RCPOs.

9.     Red flags about Defendants' practices have led at least 15 financial institutions to close accounts opened by Defendants. When that happens, Defendants typically open new accounts with different financial institutions.

10.     The Ohio Attorney General previously sued principal defendant Bruce Woods and the corporate predecessors of defendants Madera Merchant Services and B&P Enterprises for unlawfully processing RCPOs on behalf of a Canadian telemarketing scheme, and secured a judgment and injunction against them. That state action, however, has failed to deter Defendants, who have continued their scheme, violating the FTC Act, the TSR, and Ohio's CSPA, and causing consumers to lose more than $18 million since January 2016.

## PLAINTIFFS

11.     The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

12.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 57b.

13.     Plaintiff State of Ohio is one of the fifty sovereign states of the United States, and by and through its Attorney General, Dave Yost, enforces the Ohio CSPA, O.R.C. 1345.01 *et seq.*, which prohibits unfair, deceptive or unconscionable acts or practices in consumer transactions. The Ohio Attorney General is authorized to initiate actions to enjoin violations of the CSPA and to obtain appropriate relief including appointment of a referee or receiver, for sequestration of assets, to reimburse consumers found to have been damaged, to carry out a transaction in accordance with a consumer's reasonable expectations, to strike or limit the application of unconscionable clauses of contracts so as to avoid an unconscionable result, or to grant other appropriate relief. O.R.C. 1345.07. Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(a), Plaintiff State of Ohio is also authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Ohio residents. This

Court has supplemental jurisdiction over Plaintiff State of Ohio's state law claims under 28 U.S.C. § 1367.

## DEFENDANTS

### *The Corporate Defendants*

14. **Madera Merchant Services, LLC, also d/b/a E Check Processing and echeckprocessing.net ("Madera")** is a Texas limited liability company with its principal places of business at 12282 Eagle Heart Dr., El Paso, TX and 479A Tracey Lane, Hudson, Wisconsin. Bruce Woods is an owner, president, and manager of Madera. Patricia Woods is an owner and manager of Madera, and Victor Rodriguez is an officer and manager of the company.

15. Madera has registered dozens of assumed names, trademarks, or tradenames in Texas and Wisconsin, including certificates and forms stating that Madera operates under the names Educare, Revit Educ Srvc, L.L. Vision, Care Value Services, E Check Processing, Aiding Education, IDR Education, AFB Center, Savings Galore, VOIP Consumer Services, MC Helper, NorthwestPharmacy.com, and Diversified Marketing Group.

16. Defendants have used the Madera assumed names, trademark and tradenames to open scores of business checking accounts at numerous banks and credit unions in Texas and Wisconsin, including Citizens State Bank, Pioneer Bank, SSB, Classic Bank, N.A., and Security Service Federal Credit Union. Defendants used these accounts to process consumer payments for third-party merchant-clients via RCPOs. Madera transacts or has transacted business in this district and throughout the United States.

17.     **B&P Enterprises, LLC ("B&P")** is a Texas limited liability company with its principal places of business at 12282 Eagle Heart Dr., El Paso and 479A Tracey Lane, Hudson, Wisconsin.  Bruce Woods and Patricia Woods are the managers of B&P. B&P was formed on or about September 12, 2018.

18.     B&P has registered at least eight assumed names in Texas, including B&P, Revit Educ Srvc, Aiding Education, AFB Center, Savings Galore, VOIP Consumer Services, DLDS, Care Value Services, and NorthwestPharmacy.com.

19.     Defendants have used the B&P assumed names to open business checking accounts at numerous banks and credit unions, including University Federal Credit Union and J. P. Morgan Chase Bank N.A.  Defendants used these accounts to process consumer payments for third-party merchant-clients via RCPOs.  B&P transacts or has transacted business in this district and throughout the United States.

### *The Individual Defendants*

20.     **Bruce C. Woods** is an owner, president, and manager of Madera and is an owner and manager of B&P.

21.     Bruce Woods has signatory authority on multiple business checking accounts in the names of Madera and B&P, and has executed numerous assumed name certificates on behalf of Madera and B&P.

22.     Bruce Woods has executed payment processing agreements with Defendants' merchant-clients on behalf of Madera, including with the telemarketing scheme American Financial Benefits Center.

23. Bruce Woods and his wife, Patricia Woods, have routinely drawn checks from Madera and B&P's bank accounts and directly debit funds from those accounts for personal expenses.

24. At all times material to this Complaint, acting alone or in concert with others, Bruce Woods has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

25. Together with the other Defendants, Bruce Woods has, in numerous instances, misled financial institutions about the nature of Madera's and B&P's business and intentionally concealed from financial institutions the fact that Defendants were opening business checking accounts in order to process consumer payments for third-party merchant-clients.

26. Bruce Woods has signed business checking account applications at numerous financial institutions that either misstate or omit the fact that Madera or B&P will use the accounts to process RCPOs for third-party merchant-clients.

27. Bruce Woods has been involved in unlawful RCPO processing for more than a decade. In 2008, the State of Ohio sued Bruce Woods and Madera's and B&P's predecessors – Banctech Processors, Inc. and Electronic Check Corporation – for unlawfully providing RCPO payment services to Canadian telemarketers, including the defendants in *FTC v. 9107-4021 Quebec, Inc., doing business as Med Provisions.*, No. 08-cv-1051 (N.D. Ohio Apr. 28, 2008), a bogus online pharmacy that sold sham "membership packages" to elderly consumers. The Ohio court found Bruce Woods and his companies liable for more than $430,000 in consumer restitution and civil penalties. *State of Ohio v. Capital Payment Systems, LLC*, No. 08 CVH 007234 (Franklin County

Court of Common Pleas filed May 16, 2008; judgment entered against all defendants on August 13, 2012).

28. Bruce Woods resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

29. **Patricia Woods** is a manager and owner of Madera and a manager of B&P.

30. Patricia Woods has signatory authority over Madera and B&P bank accounts. She has signed applications and provided her information to financial institutions to open checking accounts in the names of Madera and B&P.

31. Patricia Woods has signed checks on behalf of Madera and routinely written checks against Madera bank accounts that were cashed for the benefit of her and Bruce Woods.

32. During all or part of the times material to this Complaint, acting alone or in concert with others, Patricia Woods has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

33. Patricia Woods was an officer of one of the corporate predecessors of Madera and B&P – Banctech Processors, Inc. – that the State of Ohio sued in 2008 for providing RCPO payment processing services for telemarketers engaged in unlawful conduct. Like Madera and B&P, Banctech Processors, Inc. was a closely held corporation and had only seven employees.

34. As Secretary of Banctech Processors, Inc., Patricia Woods executed a Certificate of Secretary dated August 18, 2009, authorizing the company to file for

bankruptcy protection under Chapter 11. Patricia Woods executed that certificate less than three weeks after the State of Ohio had filed its Motion for Summary Judgment against Banctech Processors, Inc. and Bruce Woods. On August 19, 2009, the day after Patricia Woods executed the certificate, Banctech Processors, Inc. counsel filed a Notice of Filing under Bankruptcy Code and Suggestion of Stay with the Ohio court.

35. Patricia Woods resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

36. **Victor Rodriguez ("Rodriguez")** is a Wisconsin resident and the son-in-law of Bruce and Patricia Woods.

37. Rodriguez is an officer and manager of Madera.

38. Rodriguez has used the email address vrodriguez@echeckprocessing.net to transact business on behalf of Defendants.

39. During all or part of the times material to this Complaint, acting alone or in concert with others, Rodriguez has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

40. Rodriguez signed business checking account applications at numerous financial institutions that either misstate or omit the fact that Madera will use the accounts to process RCPOs for third-party merchant-clients.

41. Rodriguez has signatory authority over Madera and B&P bank accounts. In multiple instances, he has provided assumed name certificates and application paperwork to financial institutions that misrepresented the nature of Madera's and B&P's business and the reason for opening the account.

42. Between October 2017 and July 2018, Rodriguez opened business checking accounts in Madera's name with at least the following five financial institutions in Wisconsin: Associated Bank, Citizens State Bank, Hiawatha National Bank, MidWestOne Bank, and River Falls State Bank.

43. Rodriguez worked for the corporate predecessors of Madera and B&P – Banctech Processors, Inc. and Electronic Check Corporation – in 2008, when the State of Ohio sued Bruce Woods and those companies for providing RCPO payment processing services for telemarketers engaged in unlawful conduct.

44. In connection with the matters alleged herein, Rodriguez transacts or has transacted business in this district and throughout the United States.

### COMMON ENTERPRISE

45. Defendants Madera and B&P have operated as a common enterprise while engaging in the unfair acts and practices alleged in the Complaint. Madera and B&P have conducted the business practices described herein through interrelated companies, which have a common business purpose, business functions, and employees; have commingled funds; and are both controlled by the individual defendants, Bruce and Patricia Woods and Rodriguez.

46. Madera and B&P share the website echeckprocessing.net, and have both listed the residence of Bruce and Patricia Woods as their business address on applications for bank accounts.

47. Because Madera and B&P have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

48.     Bruce and Patricia Woods and Rodriguez have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Madera and B&P that constitute the common enterprise.

## COMMERCE

49.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## REMOTELY CREATED PAYMENT ORDERS AND REMOTELY CREATED CHECKS

50.     An RCPO is a check or order of payment that the payee (typically a merchant or its agent) creates electronically, with software, using the payor's (typically a consumer) bank account information.

51.     Unlike with a conventional check, the payor does not sign the RCPO. Instead, the RCPO usually bears a statement indicating that the account holder (the account from which the money is to be drawn) authorized the check, such as "authorized by account holder" or "signature not required."

52.     RCPOs can be printed and manually deposited into the check clearing system like a conventional check. An electronic version of an RCPO that looks like a paper check, but never exists in paper form, can also be deposited into the check clearing system using remote deposit capture – a system that allows a depositor to scan checks remotely and transmit the check images to a bank for deposit.

53.     RCPOs are generally subject to less oversight and monitoring than more prevalent methods of consumer payments, such as Automated Clearinghouse ("ACH") and debit and credit card transactions.

54. Payments cleared through the ACH network are subject to oversight by NACHA - The Electronic Payments Association ("NACHA"), a self-regulatory trade association that enforces a system of rules, monitoring, and penalties for noncompliance. NACHA monitors the levels at which ACH debits are returned (or rejected) by consumers or consumers' banks, among other reasons, because high rates of returned transactions can be indicative of unlawful practices.

55. The credit and debit card networks ("card networks"), such as MasterCard and Visa, also have rules regarding onboarding and monitoring of merchants, and penalties for noncompliance. These include heightened monitoring requirements for merchants designated as high risk, such as telemarketers.

56. The card networks require network participants – including merchants, payment processors, and merchant banks – to monitor transactions for unusual activity indicative of fraud or deception. One prominent indicator is high chargeback rate. Chargebacks occur when customers contact their credit card issuing bank to dispute a charge appearing on their credit card account statement. Merchants with high chargeback rate may be placed in a monitoring program and their sponsoring banks may be subject to fees and fines.

57. Unlike ACH and debit and credit card transactions, RCPOs are not subject to centralized and systemic monitoring.

58. Since June 13, 2016, the TSR has prohibited sellers and telemarketers, whether making outbound calls or accepting inbound calls, from using RCPOs in telemarketing sales. The FTC added this prohibition to the TSR because, after an

extensive notice and comment process, it found little record of legitimate telemarketing business using RCPOs.

## **DEFENDANTS' UNLAWFUL BUSINESS PRACTICES**

59. Defendants offer third-party payment processing services to merchants-clients using RCPOs.

60. Defendants market their RCPO payment processing service to telemarketers and other merchants that financial institutions and the card networks consider high risk. Their website, echeckprocessing.net, caters to merchants "considered high risk by" banks and further states that "there are no chargebacks with" RCPOs.

61. Although the TSR specifically bars the use of RCPOs in telemarketing sales, some of Defendants' largest merchant-clients, including Educare, sell their products or services through telemarketing.

62. Defendants file assumed name and trademark or tradename certificates for Madera and B&P in Texas and Wisconsin under the names and dbas of their merchant-clients.

63. Using these certifications, Defendants apply for business checking accounts with financial institutions, misrepresenting the services provided by Madera or B&P and failing to disclose that Defendants will use the accounts to process consumer payments for third-parties.

64. For example, a Madera application for business checking accounts at Pioneer Bank SSB in Sugar Land, Texas, under the dbas Aiding Education and Savings Galore, which Bruce Woods signed on June 28, 2018, falsely represented that Madera

operated a student loan document preparation assistance service (Aiding Education) and a "savings club" (Savings Galore).

65.     The June 28, 2018 application also falsely represented that Madera does not engage in processing payments for third-parties.

66.     Additionally, on or about June 6, 2018, Madera opened a business checking account with Citizens State Bank in Hudson, Wisconsin, to process RCPOs for Educare. Defendants opened the account under the name Madera Merchant Services doing business as Revit-Educ-Srvc.

67.     The application that Defendants submitted to Citizens State Bank gave no indication that Defendants would use the business checking account to process payments for a third-party telemarketer. Instead, Defendants falsely identified Madera as a "Parent Holding Company" that provides "Document Preparation Service" under the name Revit-Educ-Srvc.

68.     After Defendants secure the business checking accounts, often using false or misleading information, they deposit printed or electronic copies of RCPOs that they create with software, which include the name and often the phone number of their merchant-clients. These items enter into the check clearing system and are presented to the financial institutions of consumers.

69.     The funds from consumers' accounts, drawn through Defendants' RCPOs, are deposited into the business checking accounts that Defendants opened using their merchant-clients' dbas.

70.     Ultimately, Defendants transfer the consumer funds, minus Defendants' service fee, to their merchant-clients.

71.     In numerous instances, RCPOs deposited by Defendants are not honored by the consumers' financial institutions. Consumers' financial institutions have provided the following reasons for returning RCPOs generated by Defendants: "stop payment"; "forgery"; "closed account"; "unable to locate"; and "insufficient funds."

72.     In many instances, high rates of returned (dishonored) payments, at times exceeding 20%, have led financial institutions that host Defendants' accounts to investigate the accounts and their owners. Such investigations have often resulted in the closing of Defendants' accounts.

73.     To maintain their RCPO processing scheme, Defendants have continually opened new business checking accounts at different financial institutions.

74.     For example, within days of opening a business checking account with Citizens State Bank in Hudson, Wisconsin, under the name Madera Merchant Services doing business as Revit-Educ-Srvc (an Educare dba), Defendants made a $6,465 deposit made up entirely of RCPOs drawn against consumer bank accounts from various states. Many of these RCPOs were dishonored and returned to Citizens State Bank.

75.     Citizens State Bank then discovered that Madera had filed eight different trademark names (dbas) in the state of Wisconsin within six months. The bank also discovered that many consumers posted complaints on the internet claiming that companies using those dbas had fraudulently taken funds from their bank accounts.

76.     On or about June 12, 2018, Citizens State Bank froze the funds in the Madera accounts, and ultimately closed them on June 20, 2018.

77.     Between June 20, 2018 and June 29, 2018, Defendants opened new accounts for RCPO processing under dbas of Educare Center Services with at least four

other banks in Texas/Wisconsin, including BancCorpSouth Bank, First United Bank and Trust Company, Pioneer Bank, SSB, and Prosperity Bank.

78.     Within the last five years, Defendants have opened at least 60 business checking accounts at 25 different financial institutions, mostly in Texas and Wisconsin, to enable their processing scheme. Defendants have processed more than $18 million in consumer payments on behalf of their merchant-clients through these accounts.

79.     In some instances, Defendants have opened multiple, seemingly unrelated, accounts for a merchant-client under two or more dbas at the same bank or credit union.

80.     Defendants' RCPO processing scheme, as described above, has caused and is likely to cause substantial injury to consumers. Within the last four years, Defendants have processed consumer payments in excess of $13 million for at least three telemarketing schemes sued by the FTC and state attorneys general for consumer fraud or deception, including:

- Educare – credit card interest rate reduction scheme for which Defendants processed at least $11.8 million, *FTC v. Educare Center Services* (W.D. Tex. filed concurrently with this action);

- Impetus Enterprise, Inc. ("Impetus") – student loan debt relief scheme for which Defendants processed at least $580,000, *FTC v. Impetus Enterprise, Inc.*, No. 8:18-cv-01987 (C.D. Cal. filed Nov. 6, 2018, preliminary injunction entered Nov. 29, 2018);

- American Financial Benefits Center ("AFB Center") – student loan debt relief scheme for which Defendants processed at least $566,000, *FTC v. American*

*Financial Benefits Center*, No. 4:18-cv-00806 (N.D. Cal. filed Feb. 7, 2018, preliminary injunction entered Nov. 29, 2018).

81.     Defendants executed at least $8.646 million of the above-noted RCPO processing after June 13, 2016, the date at which using RCPOs in any telemarketing sales became illegal under the TSR.  After June 13, 2016, Defendants processed more than:

- $7,500,000 for Educare;

- $580,000 for Impetus; and

- $566,000 for AFB Center.

## DEFENDANTS HAVE KNOWN OR CONSCIOUSLY AVOIDED KNOWING THAT THEIR MERCHANT CLIENTS ARE ENGAGED OR LIKELY TO ENGAGE IN DECEPTIVE OR FRAUDULENT TELEMARKETING

82.     Defendants, including Bruce and Patricia Woods and Rodriguez, have known or consciously avoided knowing that some of their largest merchant-clients – including Educare, Impetus, and AFB Center – have been or are likely to have been engaged in deceptive or fraudulent telemarketing.

83.     Defendants have specifically catered to high risk merchants who find it hard to obtain more conventional payment processing and are concerned about chargebacks by consumers.

84.     Defendants' website includes an "Echeck Processing Merchant Application" ("Application").  The Application includes checkboxes for "Inbound Call Center" and "Outbound Call Center" in a field titled "Type of Business."  The Application further states:

> Describe specific Products or Services offered by company and how Echeck services will be used in connection with these Products or Services.  Please provide complete details to include each web site

address, each phone number for inbound call centers, and each phone number utilized for customer service/consumer complaints. If any Products or Services are sold telephonically, please provide a copy of the sales and verification script for each Product or Service being offered. Attach additional sheet or other information if needed (e.g. marketing materials, business plan, etc.).

85. Defendants have known that many of the RCPOs they generate for their merchant-clients have been returned for reasons such as "stop payment," "forgery," "closed account," and "unable to locate."

86. Defendants, including Bruce and Patricia Woods and Rodriguez, have received notices and telephone calls from financial institutions that closed Madera's and B&P's accounts in which the financial institutions informed them about their concerns with Defendants' business practices, consumer complaints about fraud, and returned RCPOs.

87. Defendants' telemarketing merchant-clients – including Educare, Impetus, and AFB Center – have been sued by the FTC, received scores of Better Business Bureau ("BBB") complaints, and/or received "F" BBB ratings.

88. Educare, one of Defendants' oldest and most prolific merchant-clients, is a credit card interest rate reduction telemarketer that has received more than 100 BBB complaints and has had an "F" Rating from the BBB since at least February 2015. Numerous complaints, publicly available on the BBB's website, state that Educare contacts consumers via a phone call.

89. Since at least 2017, Defendants have opened no fewer than 17 accounts for processing RCPOs for Educare at 15 banks and credit unions because such accounts have often been quickly closed by the banks and credit unions due to high return rates or because the banks and credit unions deem the accounts a high risk.

90.     Defendants have opened accounts under various dbas of Educare, including accounts under the dbas Tripletel, Inc., Revit-Educ-Srvc, L.L. Vision, and Card Value Services. At least four of the Educare accounts had return rates of 20% or more.

91.     As the examples below demonstrate, banks and credit unions that Defendants use for their RCPO processing often determine that these accounts are used for dubious conduct.

92.     Defendants opened two business checking accounts at University Federal Credit Union in Austin, Texas, under the dbas Revit-Educ-Srvc and Aiding Education to process RPCOs for Educare and Impetus, respectively.

93.     After RCPOs deposited into the Revit-Educ-Srvc account were returned, as part of the credit union's standard process regarding returned checks, a risk analyst reviewed the "checks" Defendants deposited into their account and was troubled by what she discovered. The items deposited into Defendants' account were not checks, but unsigned RCPOs drawn against the bank accounts of consumer from various states.

94.     Because the items were not signed by the consumers whose bank accounts the funds would be drawn on, the risk analyst considered the RCPOs to be high risk items. In the risk analyst's 13 years of experience working with returned checks, she had never observed so many unsigned RCPOs deposited into a single account.

95.     The risk analyst called the toll free number 877-403-1659, printed on one of Defendants' returned Revit-Educ-Srvc RCPOs, and spoke to a man with a heavy foreign accent who told the risk analyst that she had reached a "credit card service" company. She asked the man to clarify what that meant and he stated that the company "lowers the interest rate on your credit card." When the risk analyst asked him if the

name of the business was Revit-Educ-Srvc, he said "just a moment," and then came back on the line and told her that if she was not a customer or client, then he could not release that information. After the risk analyst reported her findings, the credit union put a hold on the deposited funds, refused to accept new deposits, and began the process of closing Defendants' accounts.

96.     Defendants had been providing RCPO processing services to Impetus since at least December 2017. Between December 12, 2017, and September 19, 2018, Defendants sequentially opened accounts to process RCPOs for their merchant-client Impetus using Impetus dbas Aiding Education and IDR Education at no less than six banks and credit unions, because banks and credit unions promptly closed such accounts upon learning of the high numbers of returned checks, online consumer complaints, and due to the high risk nature of the unsigned RCPOs.

97.     For example, on or about July 10, 2018, Defendants opened a business checking account for Impetus under its dba IDR Education at R Bank in Georgetown, Texas. After numerous RCPOs Defendants deposited into the account were returned, on or about August 7, 2018, R Bank sent a letter to Bruce Woods informing him that R Banks was closing the accounts within 10 days and would no longer accept deposits.

98.     Defendants continued to process RCPOs on behalf of Impetus until the FTC sued Impetus on November 6, 2018. Defendants were served with a copy of the Temporary Restraining Order entered against Impetus on or about November 16, 2018.

99.     Around the spring of 2016, Defendants began providing RCPO processing services to AFB Center. On February 7, 2018, the FTC sued AFB Center, alleging that AFB Center and its owner had operated a deceptive student loan debt relief telemarketing

scheme. *See FTC v. American Financial Benefits Center,* No. 4:18-cv-00806 (N.D. Cal. Feb. 7, 2018). The FTC announced the action on the same day. *FTC Charges Ameritech and Brandon Frere with Deceiving Consumers* https://www.ftc.gov/news-events/press-releases/2018/02/ftc-charges-student-loan-debt-relief-scheme-deceiving-consumers.

100.    The FTC's action specifically challenged AFB Center's telemarketing conduct, and the TSR bars the use of RCPOs for any telemarketing sales. Nevertheless, Defendants continued to provide RCPO processing to AFB Center through at least November 2018, approximately nine months after the FTC sued AFB Center. Moreover, Defendants opened new business checking accounts to process for AFB Center on or about July 12, 2018, at Associated Bank, and on September 11, 2018, at Horizons Bank.

101.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission.

## OHIO'S TELEPHONE SOLICITOR'S REGISTRATION REQUIREMENT

102.    Ohio's Telephone Solicitation Sales Act, O.R.C. 4719.01 *et seq.*, generally requires telephone solicitors that make telephone solicitations to individuals in Ohio to register with and file a copy of a surety bond with the Ohio Attorney General.

103.    Multiple companies that Defendants processed payments for – including Educare, Impetus, and AFB Center – were required to register as telephone solicitors and file copies of surety bonds with the Ohio Attorney General. These companies did not register as telephone solicitors, or file copies of surety bonds, with the Ohio Attorney General.

104.    Defendants knew, or should have known, that companies Defendants processed payments for – including Educare, Impetus, and AFB Center – were not in compliance with the registration and bonding requirements of Ohio's Telephone Solicitation Sales Act.

## **VIOLATIONS OF THE FTC ACT**

105.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

106.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that are not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

### **COUNT I**
### **Unfair Payment Processing**
### **(By the FTC)**

107.    As described in paragraphs 14-101 above, in numerous instances Defendants have:

  a.    Provided financial institutions with false or misleading information to obtain and maintain checking accounts, which Defendants used to process consumer payments for third-party merchants engaged in fraudulent or deceptive marketing practices; and/or

  b.    Processed consumer payments for third-party merchants that were engaged in, or likely to engage in, fraudulent or deceptive marketing practices.

108. Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

109. Therefore, Defendants' acts or practices, as set forth in Paragraph 107 above, constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

110. In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter.

111. Defendants' merchant-clients Educare, Impetus, and AFB Center are all "sellers" or "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

112. A "seller" means any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration. 16 C.F.R. § 310.2(dd).

113. A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff).

114. "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or

23

more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

115. The TSR prohibits sellers and telemarketers from creating or causing to be created, directly or indirectly, a remotely created payment order (RCPO) as payment for goods or services offered or sold through telemarketing. 16 C.F.R. § 310.4(a)(9). A remotely created payment order includes a remotely created check 16 C.F.R. § 310.2(cc).

116. It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates Section 310.3(a), (c), or (d) or Section 310.4 of this Rule. 16 C.F.R.

§ 310.3(c).

117. The TSR prohibits sellers and telemarketers from making any false or misleading statements to induce a person to pay for goods or services. 16 C.F.R. § 310.3(a)(4).

118. The Defendants knew or consciously avoided knowing that a telemarketer made a false or misleading statement to induce a person to pay for goods or services during the time periods set forth in the complaint.

119. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT II**
**<u>Assisting and Facilitating Merchants Engaged in Unlawful Telemarketing</u>**
**(By the FTC and the State of Ohio)**

120.    As described in paragraphs 14-101 above, in numerous instances, Defendants have provided substantial assistance and support, though processing of consumer payments using RCPOs, to one or more sellers or telemarketers, who Defendants knew, or consciously avoided knowing, were violating § 310.3(a)(4) and § 310.3(a)(9) of the TSR by:

        a.      Making a false or misleading statement to induce consumers to pay for goods or services; and/or

        b.      Using RCPOs as payment for goods or services offered or sold through telemarketing.

121.    Defendants' acts or practices, as described in Paragraph 120 above, violate the TSR, 16 C.F.R. § 310.3(b).

**<u>VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT</u>**

122.    Ohio's CSPA, O.R.C. 1345.01 *et seq.,* generally prohibits "suppliers" from engaging in unfair or deceptive acts or practices in connection with "consumer transactions."

123.    Defendants are "suppliers" as defined by R.C. 1345.01(C) because they, at all time relevant hereto, were engaged in the business of effecting or soliciting consumer transactions, whether or not they dealt directly with the consumers.

## COUNT III
### Unfair Payment Processing
#### (By the State of Ohio)

124. As described in paragraphs 14-101 above, Defendants committed unfair or deceptive acts or practices in violation of the CSPA, O.R.C. 1345.02, by:

    a. Providing financial institutions with false or misleading information to obtain and maintain checking accounts, which Defendants used to process consumer payments for third-party merchants engaged in fraudulent or deceptive marketing practices; and/or

    b. Processing consumer payments for third-party merchants that Defendants knew, or should have known, were engaged in, or likely to engage in, fraudulent or deceptive marketing practices.

## COUNT IV
### Processing Debits that are Unauthorized by the Account Holder
#### (By the State of Ohio)

125. As described in paragraphs 14-101 above, Defendants committed unfair or deceptive acts or practices in violation of the CSPA, O.R.C. 1345.02, by processing debits, including through RCPOs, to Ohio consumers' bank accounts that are unauthorized by the account holder.

**COUNT V**
**Processing Debits on Behalf of Telephone Solicitors Who Were Not Properly**
**Registered and Bonded with the State of Ohio**
**(By the State of Ohio)**

126.     As described in paragraphs 14-101 above, Defendants committed unfair or deceptive acts or practices in violation of the CSPA, O.R.C. 1345.02, by processing debits, including through RCPOs, to Ohio consumers' bank accounts on behalf of telephone solicitors who were not properly registered with the Ohio Attorney General's Office and bonded as required pursuant to the Ohio Telephone Solicitations Sales Act, O.R.C. 4719.02(A) and 4719.04(A).

**CONSUMER INJURY**

127.     Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and CSPA, O.R.C. 1345.02.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

128.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

129.   Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

130.   Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow Plaintiff State of Ohio to enforce its state law claims against Defendants in this Court for violations of R.C. 1345.01 *et seq*, and O.R.C. 1345.07, authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the CSPA including injunctive relief, rescission or reformation of contract, the refund of monies paid, and the disgorgement of ill-gotten monies.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs FTC and the State of Ohio, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, the TSR, Section 1345.07 of the Ohio CSPA, and the Court's own equitable powers, request that the Court:

A.   Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, and an order providing for the turnover of business records, an asset freeze, immediate access and the appointment of a receiver, and the disruption of internet domain and telephone services;

B.   Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and the Ohio CSPA, O.R.C. 1345.01 *et seq.*:

C.   Award Plaintiffs such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR and the Ohio CSPA, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.   Award Plaintiffs the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:                    /s/

J. Ronald Brooke, Jr.
Christopher E. Brown
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-3484 / jbrooke@ftc.gov
(202) 326-2825 / cbrown3@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

DAVE YOST
Attorney General

Jeffrey Loeser (pending)
(Ohio Bar #82144)
Erin Leahy (pending)
(Ohio Bar #69509)
Assistant Attorneys General
Consumer Protection Section

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30 E. Broad Street, 14th Floor
Columbus, Ohio 43215
(614) 466-8831
jeff.loeser@OhioAttorneyGeneral.gov
erin.leahy@OhioAttorneyGeneral.gov

Attorneys for Plaintiff
STATE OF OHIO