FILED

2019 JUL 18 PM 3: 20

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

**Federal Trade Commission,**

      Plaintiff,

    vs.

**State of Ohio ex rel. Attorney General Dave Yost,**

      Plaintiffs,

v.

**Madera Merchant Services, LLC,** also dba E Check Processing and echeckprocessing.net, a Texas company,

**B&P Enterprises, LLC,** a Texas company,

**Bruce C. Woods,** individually and as an owner, officer, member, and/or manager of Madera Merchant Services, LLC, and B&P Enterprises, LLC,

**Patricia Woods,** individually and as an owner, manager, and/or member of Madera Merchant Services, LLC, and B&P Enterprises, LLC,

and

**Victor Rodriguez,** individually and as an officer, member, and/or manager of Madera Merchant Services, LLC, and B&P Enterprises, LLC,

      Defendants.

                    Defendants.

**Filed Under Seal**

**Emergency Motion**

Case No.

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND OTHER EQUITABLE RELIEF**

# Table of Contents

I.     INTRODUCTION .................................................................................1

II.    THE DEFENDANTS.........................................................................2

A.    The Corporate Defendants ...........................................................3

B.    The Individual Defendants............................................................4

III.    DEFENDANTS' BUSINESS PRACTICES.......................................8

A.    Defendants' Unlawful RCPO Processing Scheme......................8

B.    Defendants Unlawfully Process RCPOs for Telemarketers.......10

    1.       AFB Center .....................................................................10

    2.       Impetus ...........................................................................11

    3.       Educare ...........................................................................12

C.    Other Clients................................................................................13

    1.       Zarvad III dba mypaydayloan.com (MYPD) ................13

    2.       Wishbone Marketing, LLC/Savings Galore ..............14

    3.       VOIP Consumer Services, Inc....................................14

D.    Consumer Harm...........................................................................14

IV.    ARGUMENT ...................................................................................15

A.    The FTC Act Authorizes This Court to Grant the Requested Relief ........15

B.    A Temporary Restraining Order is Appropriate and Necessary.................16

    1.       The FTC is Likely to Prevail on Count I (FTC Act, Unfairness)      16

    2.       Plaintiffs are Likely to Prevail on Count II (Assisting and Facilitating Telemarketers in Violation of the TSR) .................................................17

    3.       Defendants Have Violated the Ohio CSPA ...........................19

i

4.      The Corporate Defendants Are Subject to Joint and Several Liability as a Common Enterprise ................................................................19

5.      The Equities Tip Decidedly in the Public's Favor.................21

C.    The Proposed *Ex Parte* TRO Is Appropriate .............................................22

D.    Allowing The Temporary Receiver Access to the Woods' Residence, which is Defendants' Main Place of Business ..........................................23

Conclusion .........................................................................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## Cases

*In re Cliffdale Assocs.*,
103 F.T.C. 110, 1984 WL 565319 (F.T.C. 1984).....................................................23

*CFTC v. Muller*, 570 F.2d 1296, 1301 (5th Cir. 1978) ..........................................22

*Delaware Watch Co. v. FTC*, 332 F.2d 745 (2d Cir. 1964) ....................................20

*FTC v. Affordable Media, LLC*,
179 F.3d 1228 (9th Cir. 1999) ...............................................................15, 16

*FTC v. Am. Nat'l Cellular, Inc.*,
810 F.2d 1511 (9th Cir. 1987) ................................................................15

*FTC. v. Assail, Inc.*, No. W03CA007 (W.D. Tex. Jan. 9, 2003) ..............................2

*FTC v. Assail, Inc.*, 410 F.3d 256 (5th Cir. 2005) ...............................2, 15, 22

*FTC v. Castle Publ'g, No.* A03CA905SS (W.D. Tex. Dec. 9, 2003)........................2

*FTC v. Commerce Planet, Inc.*,
815 F.3d 593 (9th Cir. 2016) ..................................................................15

*FTC v. Cyberspace.com, LLC*,
453 F.3d 1196 (9th Cir. 2006) ................................................................23

*FTC v. Direct Mktg. Concepts, Inc.*,
624 F.3d 1 (1st Cir. 2010) ......................................................................24

*FTC v. ELH Consulting LLC, et al.*,
No. CV-12-2246- (D. Ariz. Oct. 22, 2012) ...............................................22

*FTC v. Figgie Int'l*,
994 F.2d 595 (9th Cir. 1993).................................................................23

*FTC v. Five-Star Auto Club, Inc.*,
97 F. Supp. 2d 502 (S.D.N.Y. 2000) ...................................................23, 24

*FTC v. Freedom Foreclosure Prevention Services LLC, et al.*,
No. CV-09-1167 (D. Ariz. June 1, 2009) .................................................22

*FTC v. Gem Merchandising*,
87 F.3d 466 (11th Cir. 1996) ................................................................28

*FTC v. Gill*,
265 F.3d 944 (9th Cir. 2001).................................................................23

*FTC v. Grant Connect*,
*LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011)...........................................19

*FTC v. Home Relief Foundation, Inc., et al.*,

14-cv-00652 (W.D. Tex. July 14, 2014) ...........................................................................2

*FTC v. H.N. Singer, Inc.,*
    668 F.2d 1107 (9th Cir. 1982) .........................................................................15

*FTC v. IAB Marketing Associates, LP,* 746 F.3d. 1228, (11th Cir. 2014) .....................15

*FTC v. J.K. Publ'ns, Inc.,*
    99 F. Supp. 2d 1176 (C.D. Cal. 2000)..............................................................26

*FTC v. Kitco of Nevada, Inc.,*
    612 F. Supp. 1282 (D. Minn. 1985) ..................................................................24

*FTC v. Lifewatch Inc.,*

15-cv-5781, 2016 U.S. Dist. LEXIS 45057 (N.D. Ill. Mar. 31, 2016 .............................21

*FTC v. Minuteman Press,* 5
    3 F.Supp. 2d 248 (E.D.N.Y. 1998) ...................................................................24

*FTC v. Money Now Funding, LLC,*
    No. CV-13-01583 (D. Ariz. Aug. 5, 2013)......................................................2, 22

*FTC v. Neovi, Inc.,* 604 F.3d 1150, 1156 (9th Cir. 2010) ..........................................16

*FTC v. Network Servs. Depot, Inc.,*
    617 F.3d 1127 (9th Cir. 2010) .....................................................................5, 26

*FTC v. North Am. Mktg. and Assoc., LLC, et al.,*
    No. CV-12-914 (D. Ariz. May 2, 2012) ........................................................2, 22

*FTC v. Pantron I Corp.,*
    33 F.3d 1088 (9th Cir. 1994) ...........................................................................15

*FTC v. Publ'g Clearing House,*
    104 F.3d 1168 (9th Cir. 1997) .....................................................................20, 21

*FTC v. Southwest Sunsites, Inc.,*

    665 F.2d 711, 718 (5th Cir. 1982) ....................................................................15

*FTC v. Transnet Wireless Corp.,*
    506 F. Supp. 2d 1247 (S.D. Fla. 2007)...............................................................20

*FTC v. USA Beverages, Inc.,*
    No. 05-CV-61682, 2005 WL 5654219 (S.D. Fla. Dec. 6, 2005) .........................23

*FTC v. USA Financial, LLC,*
    415 Fed. Appx. 970 (11th Cir. 2011) ...............................................................21

*FTC v. U.S. Oil & Gas Corp.,*
    748 F.2d 1431 (11th Cir. 1984) ........................................................................23

*FTC v. Weyerhaeuser Co.,* 665 F.2d 1072........................................................................21

*FTC v. Windward Mktg.*,
No. 1:96-CV-615F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997).....................20

*FTC v. World Travel Vacation Brokers, Inc.*,
861 F.2d 1020 (7th Cir. 1988) ...............................................15, 16, 21

*FTC v. World Wide Factors, Ltd.*,
882 F.2d 344 (9th Cir. 1989) ...............................................................21

*SEC v. Brown, et al.*, 15-cv-00119 (W.D. Tex. Apr. 13, 2015) ............................2

*SEC v. First Fin. Group*,
645 F.2d 429 (5th Cir. 1981)...............................................................23

*SEC v. Ponta Negra Fund L LLC, et al.*,

09-cv-00324 (W.D. Tex. Apr. 27, 2009) ..................................................2

*United States V. Thermo Prods. Co.*,

1986 U.S. Dist. LEXIS 30437 (W.D. Tex. Jan. 15, 1986) .............................15

*Zale Corp. & Corrigan-Republic v. FTC*, 473 F.2d 1317, 1320 (5th Cir. 1973) .............19

**Federal and State Statutes and Regulations**

15. U.S.C. § 45 (a) ...................................................................1, 5

15 U.S.C. § 53 (b) ...................................................................1, 15

15 U.S.C. §§ 6101, *et seq.*...........................................................1, 5

16 C.F.R. § 310 ...................................................................2, 10, 17

Ohio CSPA O.R.C. 1345.01 *et seq.* ..................................................19

# I.     INTRODUCTION

For more than a decade, Defendants, one of whom is a scofflaw, previously sued for the same activity, have been running a third-party payment processing scheme that uses remotely created payment orders or remotely created checks ("RCPOs")[1] to withdraw money from consumers' accounts on behalf of third-party merchants. Many of these merchants are perpetrators of fraud and deceptive schemes, including telemarketing schemes. The schemes supported by Defendants have included, among others, two student debt relief telemarketing schemes sued by the FTC,[2] an offshore payday loan scheme and a buyers club scheme both sued or cited by state regulators, and a credit card interest-reduction telemarketing scheme known as Educare Centre Services, Inc. ("Educare"). Educare is one of Defendants' largest current clients, if not the largest. Concurrent with this filing, Plaintiffs are filing a related 13(b) action against Educare in this District.

To execute their processing scheme, Defendants have opened business checking accounts under various assumed names with numerous local banks and credit unions. They often misrepresent the type of business for which they open the account, and routinely fail to disclose that it will be used to process consumer payments for third-party merchants via RCPOs. High rates of returned checks and other red flags have led many financial institutions to close accounts that Defendants used for their RCPO scheme. When that happens, Defendants open new accounts with different financial institutions. Defendants have opened such accounts at more than 25 banks and credit unions, mostly in Texas and Wisconsin.

Defendants' deceptive conduct violates Section 5(a) of the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45(a), the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101 *et seq.*, and the Telemarketing Sales Rule ("TSR"), 16 CFR Part 310, which explicitly prohibits the use of RCPOs in any type of

---

[1] *See* PX 10 Examples of RCPOs Deposited by Defendants. These are essentially paper or electronic demand drafts in which Defendants prepare the payment instrument and sign for consumers.
[2] *FTC v. American Financial Benefits Center*, 4:18-cv-00806 (N.D. Cal. filed Feb. 7, 2018) and *FTC v. Impetus Enterprise, Inc.*, 8:18-cv-01987 (C.D. Cal. filed Nov. 6, 2018).

telemarketing transactions. 16 C.F.R. 310.4(a)(9). Defendants' conduct also violates the Ohio Consumer Sales Practices Act ("CSPA"), R.C. 1345.01 *et seq.*

Defendants' payment processing scheme has caused consumers to lose more than $18 million since January 2016. Moreover, since June 2016, when the TSR prohibition on the use of RCPOs in telemarketing transactions went into effect, Defendants have illegally processed more than $8.6 million in RCPO payments generated by telemarketing schemes.

The FTC and the State of Ohio (collectively "Plaintiffs") respectfully request that the Court bring Defendants' unlawful scheme to an immediate halt.[3] To protect consumers and preserve assets for consumer redress to Defendants' victims, Plaintiffs seek an *ex parte* temporary restraining order ("TRO") that enjoins Defendants' unlawful conduct, freezes their assets, appoints a temporary receiver over the Corporate Defendants, permits the receiver immediate access to Defendants' business records, requires Defendants to disclose their assets, and allows for expedited discovery. Plaintiffs also request that the Court order Defendants to show cause why a preliminary injunction should not issue against them. This type of *ex parte* relief has been granted in numerous instances in this Circuit, including in this District.[4]

## II. THE DEFENDANTS

Husband and wife Bruce and Patricia Woods run the RCPO payment processing

---

[3] To support their Motion, Plaintiffs submit # volumes of evidence and supporting exhibits consisting of: Vol. I (Declaration of FTC Investigator Christine Barker (PX 1), Declaration of Ohio Office of Attorney General ("OAG") Investigator John Isaacs (PX 2), Declaration from Dawn M. Harwell of Citizens State Bank (PX 3), and Declaration from Kimberly Mayo of University Federal Credit Union (PX 4). Declarations are cited by their exhibit number (Plaintiffs' Exhibit "PX. [number]") and, where appropriate, include citations to specific paragraphs ("¶") and pertinent attachments ("Att. [letter or number]"), followed by declarant's name.

[4] *See, FTC v. Home Relief Foundation, Inc., et al.,* 14-cv-00652 (W.D. Tex. July 14, 2014); *FTC v. Castle Publ'g,* No. A03CA905SS (W.D. Tex. Dec. 9, 2003); *FTC. v. Assail, Inc.,* No. W03CA007 (W.D. Tex. Jan. 9, 2003) *SEC v. Ponta Negra Fund L LLC, et al.,* 09-cv-00324 (W.D. Tex. Apr. 27, 2009); *SEC v. Brown, et al.,* 15-cv-00119 (W.D. Tex. Apr. 13, 2015). Cases in other Texas district courts include: *FTC v. Advert Marketing, Inc.,* No. 4:13-cv-00590 (S.D. Tex. Mar. 5, 2013); *FTC v. Websource Media, L.L.C.,* No. 4:06-cv-1980 (S.D. Tex. June 12, 2006); *FTC v. Trustsoft, Inc.,* No. 4:05-cv-1905 (S.D. Tex. June 1, 2005); *FTC v. Vega,* No. 4:04-cv-1478 (S.D. Tex. Apr. 26, 2004); *FTC v. Churchill,* No. G-00-324 (S.D. Tex. June 16, 2000). *FTC v. Strobel,* No. 2:08-CV-326 (E.D. Tex. Aug. 28, 2008); *FTC v. Payneless Credit Repair, L.L.C.,* No. 3-08CV1160-M (N.D. Tex. July 10, 2008); *FTC v. Nat'l Home Team Solutions, L.L.C.,* 4:08-CV-00067-RAS (E.D. Tex. Feb. 27, 2008); *FTC v. Think All Publ'g, L.L.C.,* No. 4:07CV11 (E.D. Tex. Jan. 10, 2007).

scheme at issue, together with their son-in-law, Victor Rodriguez (collectively the "Individual Defendants"). Since at least 2016, they have operated the scheme as a common enterprise through at least two closely-held companies – Madera Merchant Services, LLC and B&P Enterprises, LLC (collectively the "Corporate Defendants").

### A. The Corporate Defendants

**Madera Merchant Services, LLC** ("Madera"), also doing business as also d/b/a E Check Processing and echeckprocessing.net, is a Texas limited liability company with its principal places of business at 12282 Eagle Heart Dr., El Paso, TX and 479A Tracey Lane, Hudson, Wisconsin.[5] Bruce Woods is an owner, president, and manager of Madera. Patricia Woods is an owner and manager, and Victor Rodriguez is an officer and manager of Madera.[6]

Madera has registered dozens of assumed names, trademarks, or tradenames in Texas and Wisconsin, including certificates and forms stating that Madera operates under the names Educare, Revit Educ Srvc, L.L. Vision, Care Value Services, E Check Processing, Aiding Education, IDR Education, AFB Center, Savings Galore, VOIP Consumer Services, MC Helper, NorthwestPharmacy.com, and Diversified Marketing Group.[7] Defendants have used these names to open scores of business checking accounts at numerous banks and credit unions in Texas and Wisconsin, including Citizens State Bank, Pioneer Bank, SSB, Classic Bank, N.A., and Security Service Federal Credit Union.[8] Defendants used the accounts to process consumer payments for third-party merchant-clients via RCPOs.

Madera has operating bank accounts at Bank of America and J.P. Morgan Chase Bank that receive funds from the RCPO processing accounts.[9] Defendants transfer the funds from these non RCPO processing operating accounts, minus Defendants' fees, to their clients, which include offshore operations.[10]

---

[5] PX 1 Declaration of FTC Investigator Barker ("Barker") ¶ 2. These addresses are also the residences of Woods and Rodriguez. *Id.*
[6] *Id.*
[7] PX 1 Barker ¶ 5.
[8] PX 1 Barker ¶ 34.
[9] PX 2 Declaration of Ohio Office of Attorney General ("OAG") Investigator John Isaacs ("Isaacs") ¶ 5.
[10] PX 2 Issaacs ¶ 6.

**B&P Enterprises, LLC** ("B&P") is a Texas limited liability company with its principal places of business at 12282 Eagle Heart Dr., El Paso and 479A Tracey Lane, Hudson, Wisconsin. Bruce and Patricia Woods are the managers and owners of B&P. B&P was formed on or about September 12, 2018.[11]

B&P has registered at least eight assumed names in Texas, including B&P, Revit Educ Srvc, Aiding Education, AFB Center, Savings Galore, VOIP Consumer Services, DLDS, Care Value Services, and NorthwestPharmacy.com.[12] Defendants have used these names to open business checking accounts at various banks and credit unions, including University Federal Credit Union and J. P. Morgan Chase Bank N.A.[13] Defendants have used these accounts to process consumer payments for third-party merchant-clients via RCPOs. Defendants regularly transfer funds from the B&P RCPO processing accounts to Madera's operating bank accounts.

The Corporate Defendants operate as a common enterprise; among other things they share control/ownership, have common employees, website, and clients.[14] The principal place of business for both companies is 12282 Eagle Heart Dr., El Paso, TX, which is Bruce and Patricia Woods' residence. The Corporate Defendants have intermingled their funds[15] and the Individual Defendants use the Corporate Defendants for one common purpose: executing the RCPO payment processing scheme at issue.[16]

### B. The Individual Defendants

The Individual Defendants are the officers and owners of the Corporate Defendants. They have authority to control the Corporate Defendants, manage their bank accounts, and sign documents on their behalf.

---

[11] PX 1 Barker ¶ 2. It appears that the Mr. and Mrs. Woods and Rodriguez decided to add another corporate entity through which to operate their scheme after the Royal Credit Union, on July 19, 2018, warned them that it was reporting their closed account to ChexSystems, an entity that many financial institutions use to research a potential customer prior to opening an account. PX 1 Barker ¶ 56.

[12] PX 1 Barker ¶ 6.

[13] PX 1 Barker ¶ 35.

[14] PX 2 Isaacs ¶ 6.

[15] *Id.*

[16] PX 1 Barker ¶ 45.

**Bruce C. Woods** is an owner, president, and manager of Madera and is an owner and manager of B&P.[17] He appears to be the mastermind of the scheme. Funds held in Madera's bank accounts have been used for Bruce Woods' personal benefit.[18]

Bruce Woods has signed payment processing agreements with merchant-clients on behalf of the Corporate Defendants and filed numerous assumed name certificates for them.[19] He has opened dozens of business checking accounts in the names of Madera and B&P to process third-party RCPO payments.[20] Bruce Woods has, in numerous instances, misled financial institutions about the nature of the Corporate Defendants' business, concealing the fact that Defendants were opening business checking accounts in order to process consumer payments for third-party merchant-clients.[21] For example, on June 28, 2018, Bruce Woods signed a Madera application for business checking accounts at Pioneer Bank SSB in Sugar Land, Texas, under the dba Aiding Education.[22] The application represented falsely that Madera operated a student loan document preparation assistance service.[23] The application also represented falsely that Madera does not engage in processing payments for third parties.[24]

Similarly, on June 20, 2018, Bruce Woods signed a Prosperity Bank checking account application on behalf of Madera dba Revit Educ Srvc (Revit Educ Srvc is actually a dba of Educare) that falsely described Madera's business as a "Student Loan Consol."[25] He used the same false description on another Prosperity Bank checking

---

[17] PX 1 Barker ¶ 2.
[18] PX 2 Isaacs ¶ 7.
[19] PX 1 Barker ¶¶ 11, 61.
[20] PX 1 Barker ¶ 11.
[21] PX 1 Barker ¶¶ 45-55.
[22] PX 1 Barker ¶ 46.
[23] PX 1 Barker ¶ 46.
[24] PX 1 Barker ¶ 58. Similarly, in other applications for business checking accounts at Citizens State Bank, Defendants have claimed that Madera or B&P was a "Parent Holding Company" that provides "Document Preparation Service." *Id.* Moreover, defendants have told banks and credit unions that the accounts were "operating" accounts or would be used for "document preparation." *See* Barker ¶ 51.
[25] PX 1 Barker ¶ 55.

account application for Madera dba MYPD.[26] MYPD is the dba of Madera merchant-client MyPayDayLoan.com – an offshore, online payday loan operation.[27]

Bruce Woods has received numerous notices from financial institutions that RCPOs deposited by Defendants had been returned,[28] or the financial institution had decided to close accounts opened by the Corporate Defendants because of concerns about illegitimate conduct.[29]

Bruce Woods is a scofflaw. In 2008, the State of Ohio sued him and the corporate defendants' predecessors – Banctech Processors, Inc. ("Banctech") and Electronic Check Corporation – for unlawfully providing RCPO payment services to Med Provisions, a Canadian telemarketer that had been sued by the FTC for operating a bogus online pharmacy selling sham "membership packages" to elderly consumers.[30] The Ohio court found Bruce Woods and his companies liable for more than $430,000 in restitution and civil penalties, and permanently enjoined them from processing RCPO payments for unlawful telemarketers.[31]

**Patricia Woods** is a manager and owner of Madera and a manager of B&P.[32] She has signatory authority over Madera and B&P bank accounts, and has signed applications and provided her information to financial institutions to open checking accounts in the names of the Corporate Defendants.[33] Patricia Woods has signed checks on behalf of Madera and routinely written checks against Madera bank accounts that were cashed for

---

[26] PX 1 Barker ¶ 54.

[27] PX 1 Barker ¶ 67. RCPOs created and deposited by Defendants included the following telephone number: (888) 269-2303. This toll free number corresponds with MyPayDayLoan.com, an online payday loan provider. The payday loan provider has an "F" rating with the Better Business Bureau. The operation appears to be run by Zarvad III Ltda. and Zarvad III S.A. MyPayDayloan.com has been cited by at least three state regulators in California, Washington, and New Hampshire for violating state payday lending laws by operating without a license. *Id.*

[28] PX 4 Declaration from Kimberly Mayo of University Federal Credit Union ("UFC") ¶¶ 10 and 13.

[29] PX 1 Barker ¶ 51. Account Closing Letter to Madera noting that the account under the dba Educare "has been closed due to the return of numerous fraudulent items."

[30] PX 1 Barker ¶ 17. *FTC v. 9107-4021 Quebec, Inc., et al.*, 08-cv-1051 (N.D Ohio filed April 28, 2008).

[31] PX 1 Barker ¶ 19. *Ohio v. Capital Payment Systems, LLC, et al.*, No. 08 CVH 007234 (Franklin Co. Ct. filed May 16, 2008, judgment entered Aug. 13, 2012).

[32] PX 1 Barker ¶¶ 2,3.

[33] PX 1 Barker ¶ 13.

the benefit of her and her husband.[34]  Like her husband, Patricia Woods was an officer of Banctech when it was sued by Ohio.[35]

Victor Rodriguez ("Rodriguez") resides at 479A Tracey Lane, Hudson, Wisconsin.[36]  He is an officer and manager of Madera,[37] and has used the email address vrodriguez@echeckprocessing.net to transact business on behalf of the scheme. Rodriguez has signatory authority over Madera and B&P bank accounts.[38]  In multiple instances, he has provided application paperwork to financial institutions that misrepresented the nature of Defendants' business and the reason for opening the account.[39]  He has signed business checking account applications at numerous financial institutions that either misstate or omit the fact that Defendants will use the accounts to process RCPOs for third-party merchant-clients.[40]  Madera has filed assumed name certificates in Wisconsin in furtherance of the scheme using Rodriguez's home address as Madera's address.[41]  Between October 2017 and July 2018, Rodriguez opened business checking accounts in the Corporate Defendants' names with at least the following financial institutions in Wisconsin:  Associated Bank, Citizens State Bank, Hiawatha National Bank, MidWestOne Bank, and River Falls State Bank.[42]

Rodriguez knows that several of Defendants' merchant-clients are engaged in or likely to be engaged in telemarketing, and that many of defendants' merchant-clients, including the telemarketers, are engaged in or likely to be engaged in fraud.[43]  Like Bruce Woods, Rodriguez has received returned checks, telephone calls, and notices from banks and credit unions informing him that the institutions were closing Corporate Defendants' accounts due to high returns, complaints, or illegitimate conduct.[44]  Like the

---

[34] PX 2 Isaacs ¶ 7.
[35] PX 1 Barker ¶ 20.
[36] PX 1 Barker ¶ 14.
[37] PX 1 Barker ¶ 2.
[38] PX 1 Barker ¶ 15.
[39] PX 1 Barker ¶ 15.
[40] Id.
[41] PX 1 Barker ¶ 41.
[42] PX 1 Barker ¶ 42.
[43] PX 3 Declaration from Dawn M. Harwell of Citizens State Bank ("CSB") ¶¶ 12 and 14.
[44] PX 1 Barker ¶ 56 and PX 3 CSB ¶¶ 12 and 14.

7

Woods, Rodriguez worked for Banctech when Ohio sued Bruce Woods and Banctech for illegal RCPO processing. [45]

## III.    DEFENDANTS' BUSINESS PRACTICES

### A.    Defendants' Unlawful RCPO Processing Scheme

As stated on their website, echeckprocessing.net (last visited on July 12, 2019), Defendants market their RCPO services to telemarketers and other merchants that financial institutions and the card networks consider high risk.[46] Defendants file assumed name and trademark or tradename certificates for the Corporate Defendants in Texas and Wisconsin under the names and dbas of their merchant-clients.[47] Using these certifications, Defendants apply for business checking accounts with financial institutions, misrepresenting the services they provide and failing to disclose that they will use the accounts to process consumer payments for third parties. [48]

After Defendants secure a business checking account, they begin depositing printed or electronic copies of RCPOs drawn against consumers' bank accounts. The RCPOs include the merchant-client's name/dba and phone number. The bank or credit union enters the deposited RCPOs into the check clearing system, and the RCPOs are presented to the consumers' financial institutions. Funds from consumers' bank accounts are withdrawn and deposited into the Corporate Defendants' checking accounts. Defendants transfer these funds to one of their operating accounts at Bank of America or Chase, then distribute them to their merchant-clients.

Often, the RCPOs generated and deposited by Defendants are not honored by the consumers' financial institutions, but "returned" for the reasons such as: "stop payment"; "forgery"; "closed account"; "unable to locate"; and "insufficient funds." In many instances, high rates of returned payments, at times exceeding 20%,[49] and other red flags, such as the deposit of numerous unsigned RCPOs,[50] have led financial institutions to

---

[45] PX 1 Barker ¶ 18.
[46] PX 1 Barker ¶ 64. Defendants website, echeckprocessing.net, caters to merchants "considered high risk by" banks and further states that "there are no chargebacks with" RCPOs.
[47] PX 1 Barker ¶ 5.
[48] PX 1 Barker ¶¶ 45-55.
[49] PX 2 Isaacs ¶ 9.
[50] PX 3 CSB ¶10; PX 4 UFC ¶¶ 6-9, PX 1 Barker ¶ 51.

investigate the Corporate Defendants' accounts. Such investigations often result in closing of the accounts.[51]

For example, in June 2018, after several of Madera's deposited RCPOs were returned by consumers' banks, Citizens State Bank initiated an investigation, which revealed that: (1) Madera had filed eight different trademark names (dbas) in Wisconsin within six months; and (2) many consumers posted complaints online stating that companies using those dbas had fraudulently taken funds from their bank accounts. Citizens State Bank ultimately closed the accounts.[52]

Pioneer Bank SSB had a similar experience. In a July 12, 2018 Incident Report, bank staff noted: "At the time of opening Mr. Woods had stated that we were opening an account for a student loan document prep assistance service, and another smaller side account for a savings club his company also ran…" After checks were returned, bank staff ran searches for the merchants online. They found that the dbas "generally seem to be regarded as a scam" by the Better Business Bureau and that "[t]here is a slight information mismatch with the business owner's name."[53] Like Citizens State Bank, Pioneer Bank SSB closed the account.[54]

Likewise, in September 2018, after multiple deposits into a B&P checking account with University Federal Credit were returned, a credit union risk analyst was troubled to learn that the returned items were not standard checks, but unsigned RCPOs drawn against accounts from various states.[55] In the risk analyst's 13 years of experience, she had never observed so many unsigned RCPOs deposited into a single account.[56] The risk analyst called the toll free number printed on one of the returned RCPOs and spoke to a man who told her that she had reached a "credit card service" that "lowers the interest rate on your credit card."[57] When the risk analyst inquired about the business's name, the man said "just a moment," and then came back on the line and told

---

[51] PX 3 CSB ¶ 14  PX 4 UFC ¶ 12
[52] PX 3 CSB ¶ 14
[53] PX 1 Barker ¶ 47.
[54] *Id.*
[55] PX 4 UFC ¶ 6.
[56] PX 4 UFC ¶ 7.
[57] PX 4 UFC ¶ 8.

her that if she was not a customer or client, then he could not release that information.[58] After the risk analyst reported her findings, the credit union put a hold on the deposited funds, refused to accept new deposits, and began the process of closing the account.[59]

When financial institutions close their accounts, defendants open new accounts at different institutions.[60] In the last three years, defendants have opened more than 60 business checking accounts in the names of Madera and B&P at 25 different financial institutions.[61]

## B. Defendants Unlawfully Process RCPOs for Telemarketers

Since June 13, 2016, the TSR has expressly prohibited sellers and telemarketers from using RCPOs in any telemarketing sales. 16 C.F.R. 310.4(a)(9). The FTC added this prohibition to the TSR because, after an extensive notice and comment process, it found little record of legitimate telemarketing business using RCPOs.[62] Nevertheless, since June 13, 2016, defendants have processed at least $8.6 million in RCPO payments for at least three telemarketing schemes: AFB Center, Impetus, and Educare.[63] As detailed below, the first two are the subjects of past FTC actions; FTC filed an action against Educare simultaneously with this filing.

### 1. AFB Center

In February 2018, the FTC sued AFB Center and its owner, Brandon Frere, alleging that the student loan debt relief telemarketing operation had bilked more than $28 million from thousands of consumers by falsely promising that consumers' monthly

---

[58] PX 4 UFC ¶ 9.

[59] PX 4 UFC ¶ 10.

[60] PX 1 Barker ¶ 43. On or about June 12, 2018, Citizens State Bank froze the funds in the Madera accounts, and ultimately closed them on June 20, 2018. Between June 20, 2018 and June 29, 2018, Defendants opened new accounts for RCPO processing under dbas of Educare Center Services with at least four other banks in Texas and Wisconsin, including BancCorpSouth Bank, First United Bank and Trust Company, Pioneer Bank, SSB, and Prosperity Bank. *Id.*

[61] PX 1 Barker ¶ 37.

[62] See 80 FR 77519 at 77539, "Specifically, comments representing the views of financial institutions— including those serving as banks of first deposit ("BOFDs") for bank customers that purportedly deposit remotely created checks and remotely created payment orders in legitimate telemarketing transactions— failed to provide data or even anecdotal evidence about the number of bank customers that do so." Indeed, one of the cases cited in the FTC's rulemaking was against a previous client of Bruce Woods and BancTech Processors, a bogus Canadian medical discount plan telemarketer. *See FTC v. 9107-4021 Quebec, Inc., et al.* Case No. 1:08CV1051 (E.D. Ohio filed April 24, 2008). 78 FR 41199 at Note 93.

[63] PX 2 Isaacs ¶ 12.

payments would go towards paying off their student loans.[64]  On November 29, 2018, the court entered a preliminary injunction, which included a receiver over the AFB Center corporate defendants and an asset freeze against AFB Center and Frere.[65]  The Receiver's Staus report that explained why they had shut down AFB Center, noted that AFB Center's "businesses cannot operate legally and profitably going forward.  Even at this late stage – having been in litigation with the Federal Trade Commission ("FTC") since the summer of 2017 – deceptive and illegal practices are ingrained in, and are central to, the profitable operation of the business."[66]  On December 5, 2018, the US Attorney for the Northern District of California charged Brandon Frere with wire fraud.  *US v. Frere*, Case No. 3:18-mj- 71724-SK (N.D. Cal.).[67]  The FTC action is currently stayed for nine months.

Defendants had been providing RCPO services to AFB Center since Spring 2016.[68]  Bruce Woods executed the processing agreement with AFB Center.[69] Defendants opened RCPO accounts under the dba AFB Center with at least four banks: Pioneer Bank, Associated Bank, Horizon Bank, First American Bank,[70] transferring more than $566,000 in net proceeds from RCPOs to AFB Center after June 13, 2016.[71]

### 2.  **Impetus**

Impetus was another student debt relief telemarketing scheme.  One of the operators of the scheme was Tuan Duong, an FTC recidivist.[72]  On November 13, 2018, in response to the FTC action, the court issued an *ex parte* TRO, providing for an asset freeze, appointing a receiver, and authorizing access to defendants' offices.[73]  On November 29, 2018, the court granted the FTC's motion for a preliminary injunction with

---

[64] PX 1 Barker ¶ 21.
[65] PX 1 Barker ¶ 22. On December 21, 2018, the receiver filed a status report that explained why they had shut down AFB Center, noting that AFB Center's "businesses cannot operate legally and profitably going forward.  Even at this late stage – having been in litigation with the Federal Trade Commission ("FTC") since the summer of 2017 – deceptive and illegal practices are ingrained in, and are central to, the profitable operation of the business."
[66] *Id.*
[67] PX 1 Barker ¶ 24.
[68] PX 1 Barker ¶ 61.
[69] *Id.*
[70] PX 1 Barker ¶ 38.
[71] PX 2 Isaacs ¶ 13.
[72] PX 1 Barker ¶ 26.
[73] PX 1 Barker ¶27.

the same remedies as the TRO.[74]  On May 29, 2019, the court entered a stipulated final
order as to defendant Tuan Duong that includes the following findings:  (1) Duong
violated a previous order by promoting debt relief services through Impetus; and (2)
through telemarketing, Impetus made material misrepresentations about debt relief to
consumers.[75]

Defendants had provided RCPO processing services to Impetus since December
2017.[76]  They opened accounts under the dbas of Impetus with at least seven banks,
transferring more than $580,000 in net RCPO proceeds to Impetus after June 13, 2016.[77]

### 3. Educare

Educare is a credit card interest rate reduction scheme that the FTC and the State
of Ohio allege unlawfully calls consumers, often using pre-recorded "robo-calls," and
misrepresents to consumers that Educare's credit card interest rate reduction service can
significantly and permanently lower consumers' credit card interest rates.  As noted
above, Plaintiffs are suing Educare concurrently in a related action in this District.
Educare's principals reside in Canada and it uses a telemarketer located in the Dominican
Republic.[78]  Defendants have been providing RCPO services to Educare since at least
January 2016.[79]  Defendants have opened accounts under various dbas of Educare,
including Revit Educ Srvc, L.L. Vision, and Care Value Services, with at least 15 banks
and credit unions.[80]  Banks and credit unions have routinely closed accounts that
Defendants opened to process RCPOs for Educare, with at least four of the accounts
having return rates of 20% or more. [81] This rate of returned checks is extreme.  Since
2015, NACHA, the trade association governing Automated ClearingHouse (ACH)
transactions, has required banks to report and investigate any merchant with a monthly

---

[74] PX 1 Barker ¶28.
[75] PX 1 Barker ¶ 29.  The Impetus litigation is ongoing, with all of the corporate defendants in default.
[76] PX 2 Isaacs ¶ 14.
[77] PX 2 Isaacs ¶ 14.
[78] PX 1 Barker ¶ 73.
[79] PX 2 Isaacs ¶ 15.
[80] PX 1 Barker ¶ 40.
[81] PX 2 Isaacs ¶ 9.

return rate of .5 percent or more for returns categorized as unauthorized.[82] Educare also has received an "F" rating from the Better Business Bureau with numerous complaints.[83] Defendants transferred more than $7.5 million in net RCPO proceeds to Educare after June 13, 2016.[84]

### C. Other Clients

In addition to processing for telemarketers AFB Center, Impetus, and Educare, Defendants also provide RCPO services for an offshore payday loan scheme, MyPaydayLoan.com, and a buyers club scheme, Saving Galore, that were cited or sued by state regulators as described below.

#### 1. Zarvad III dba MyPaydayLoan.com (MYPD)

Defendants have opened business checking accounts under the assumed name MYPD, and RCPOs created and deposited by Defendants in those accounts included the following telephone number: (888) 269-2303.[85] This toll free number corresponds with MyPaydayLoan.com, an online payday loan provider.[86] MyPaydayLoan.com has an "F" rating with the Better Business Bureau.[87] The operation appears to be run by Zarvad III Ltda. and Zarvad III S.A.[88] In 2013 and 2014, Zarvad III Ltda. and Zarvad III S.A., doing business as MyPaydayLoan.com were cited by at least three state regulators for violating state payday lending laws by operating in the state without being licensed or registered to do business in the state.[89] Zavard III has a Costa Rican address but is registered in Panama. Defendants have sent more than $2 million to Panama to a company called Westwell Holdings, Inc.[90] Defendants' MYPD account at Security Service FCU, which was open from May 2017 through April 2018, had a return rate of 16.9%.[91]

---

[82] PX 1 Barker ¶ 62. https://www.nacha.org/news/nachas-rule-address-excessive-transaction-return-levels-goes-effect
[83] PX 1 Barker ¶ 66.
[84] PX 2 Isaacs ¶ 15.
[85] PX 1 Barker ¶ 67.
[86] *Id.*
[87] PX 1 Barker ¶ 68.
[88] PX 1 Barker ¶ 69.
[89] PX 1 Barker ¶ 70.
[90] PX 2 Isaacs ¶ 10.
[91] PX 2 Isaacs ¶ 10.

| 1 | 2. **Wishbone Marketing, LLC dba Savings Galore** |

Defendants have opened multiple accounts under the assumed name Savings Galore, many of which have been closed by the banks or credit unions.[92] Wishbone Marketing, LLC dba Savings Galore,[93] runs a purported buyers club. In December 2015, Wishbone Marketing executed a settlement with the State of Iowa agreeing to halt its unlawful enrollment of Iowa consumers into a costly buyers club membership without displaying required notices and disclosures and to refund Iowa consumers.[94] Savings Galore has an "F" rating with the Better Business Bureau.[95] Defendants have sent more than $2 million to Wishbone Marketing[96] and Defendants' Savings Galore account at Security Service FCU, which was open from March 2017 through April 2018, and had a return rate of 12.41%.[97]

3. **VOIP Consumer Services, Inc.**

Defendants have opened multiple RCPO processing accounts under the assumed name VOIP Consumer Services. One consumer who had funds withdrawn from her account by Defendants on behalf of VOIP Consumer Services, even though she had never done business with VOIP Consumer Services, noted that (1) VOIP Consumer Services gave her the runaround when she called to inquire about the unexpected withdrawal, and (2) the address printed on the RCPO under her name was at least 12 years out of date.[98]

D. **Consumer Harm**

Since 2016, Defendants' clandestine payment processing operation has processed more than $18 million in consumer payments on behalf of merchant-clients, of which, approximately $13 million was on behalf of AFB Center, Impetus, and Educare.[99]

---

[92] PX 1 Barker ¶ 71.
[93] PX 2 Issacs ¶ 11.
[94] PX 1 Barker ¶ 72.
[95] PX 1 Barker ¶ 71
[96] PX 2 Issacs ¶ 11.
[97] PX 2 Issacs ¶ 11.
[98] PX 5 Declaration from Christina Turner. ¶¶ 4-7.
[99] PX 2 Issacs ¶ 16.

# IV.   ARGUMENT

## A.   The FTC Act Authorizes This Court to Grant the Requested Relief

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), gives the Court authority to issue an injunction against violations of any provisions of law enforced by the FTC and "any ancillary relief necessary to accomplish complete justice." *FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) (*quoting FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1111-13 (9th Cir. 1982)); *see also, United States V. Thermo Prods. Co.*, 1986 U.S. Dist. LEXIS 30437 (W.D. Tex. Jan. 15, 1986) ("Section 13(b) of the FTC Act, 15 U.S.C. §53(b), authorizes the Court to issue permanent injunctions against defendants' violating the FTC Act, as well as ancillary equitable relief."). This ancillary relief can include, among other remedies, an *ex parte* TRO, a preliminary injunction, an asset freeze, and the appointment of a receiver. *See, e.g., FTC v. Assail, Inc.*, 410 F.3d 256, 263 (5th Cir. 2005) (affirming the granting and enforcement of a TRO with an asset freeze and a receiver); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir. 1982) (affirming that in Section 13(b) cases, the district courts may use "the full range of equitable remedies traditionally available."); *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1232 & n.2 (9th Cir. 1999) (TRO and preliminary injunction including asset freeze); *FTC v. Am. Nat'l Cellular, Inc.*, 810 F.2d 1511, 1512 (9th Cir. 1987) (TRO and preliminary injunction including asset freeze and appointment of a receiver). On numerous occasions, district courts in the Fifth Circuit have granted injunctive relief similar to that requested here.[100]

In determining whether to grant a preliminary injunction under Section 13(b) of the FTC Act, "a district court must (1) determine the likelihood that the FTC will ultimately succeed on the merits and (2) balance the equities." *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991).[101] "Unlike private litigants, the FTC need not demonstrate irreparable injury in order to obtain injunctive relief." *FTC v. IAB Mktg*

---

[100] See supra N. 4.
[101] *Accord FTC v. Affordable Media*, 179 F.3d 1228, 1233 (9th Cir. 1999); *World Travel Vacation Brokers*, 861 F.2d at 1029.

*Assocs LP,* 746 F.3d. 1228, 1232 (11th Cir. 2014).[102] Finally, in balancing the equities, "although private equities may be considered, public equities receive far greater weight." *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1030-31 (7th Cir. 1988) (*quoting FTC v. Warner Commc'ns*, 742 F.2d 1156, 1165 (9th Cir. 1984)).[103]

### B. A Temporary Restraining Order is Appropriate and Necessary

The evidence shows that the FTC is likely to succeed on its claims that Defendants have violated the FTC Act and the TSR, and the equities weigh heavily in favor of the requested preliminary relief.

### 1. The FTC is Likely to Prevail on Count I (FTC Act, Unfairness)

Count I of the Complaint challenges as unfair Defendants' conduct of (1) providing financial institutions with false or misleading information to obtain and maintain checking accounts, which Defendants used to process consumer payments for third-party merchants engaged in fraudulent or deceptive marketing practices; and/or (2) processing consumer payments for third-party merchants that were engaged in, or are likely to engage in, fraudulent or deceptive marketing practices.

Under Section 5 of the FTC Act, an unfair practice or act is "one that [(1)] causes or is likely to cause substantial injury to consumers which is [(2)] not reasonably avoidable by consumers themselves and [(3)] not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.S. § 45(n). "[C]onsumers are injured for purposes of the Act not solely through the machinations of those with ill intentions, but also through the actions of those whose practices facilitate, or contribute to, ill intentioned schemes if the injury was a predictable consequence of those actions." *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1156 (9th Cir. 2010).

Defendants' conduct of misleading banks and credit unions in order to operate as a clandestine RCPO processor for illegitimate schemes, including telemarketers, has

---

[102] *Accord Affordable Media*, 179 F.3d at 1233 (noting that Section 13(b) "places a lighter burden on the Commission than that imposed on private litigants by the traditional equity standard; the Commission need not show irreparable harm") (quotation omitted).
[103] *Cf. FTC v. Food Town Stores, Inc.*, 539 F.2d 1339, 1343 (4th Cir.1976) (private injuries "are not proper considerations for granting or withholding injunctive relief under Section 13(b)").

1  caused consumers injury of more than $18 million.[104]  Consumers could not have

2  reasonably avoided the injury.  Defendants' merchant-clients elicited the payments from

3  consumers through fraud or deception, and consumers had no knowledge of Defendants'

4  dealings with the financial institutions or their involvement in debiting the consumers'

5  accounts.  *See Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 976 (D.C. Cir. 1985) (injury is

6  not reasonably avoidable when consumers have no free and informed choice).  Finally,

7  the consumer injury is not outweighed by countervailing benefits to consumers or

8  competition.  Deceiving financial institutions, providing a prohibited form of payment

9  acceptance to telemarketers, and enabling consumer fraud, generate no such benefits.

10  **2.**  **Plaintiffs are Likely to Prevail on Count II (Assisting and**

11  **Facilitating Telemarketers in Violation of the TSR)**

12  Count II alleges that the Defendants assisted and facilitated unlawful

13  telemarketing schemes – including AFB Center, Impetus, and Educare – by (1)

14  processing consumer payments and (2) using RCPOs as payment for goods or services

15  offered or sold through telemarketing in violation of 16 C.F.R. § 310.3(b).  It is a

16  violation of the TSR for a person to "provide substantial assistance or support to any

17  seller or telemarketer when that person knows or consciously avoids knowing that the

18  seller or telemarketer is engaged in any act or practice that violates §§ 310.3(a), (c) or (d),

19  or § 310.4."  16 C.F.R. § 310.3(b).

20  **a.**  Substantial Assistance

21  The provision of payment processing services constitutes "substantial assistance"

22  under the TSR.  *FTC v. HES Merch. Servs.*, Civ. No. 6:12-cv-1618 (M.D. Fla. Nov. 18,

23  2014) *aff'd on other grounds, FTC v. Universal Mgmt., LLC*, 877 F.3d 1234 (11th Cir.

24  2017).

25  **b.**  Knowledge or Conscious Avoidance

26  Copious evidence demonstrates that Defendants have known, or consciously

27  avoided knowing, that: (1) merchant-clients – including AFB Center, Impetus, and

28  Educare – were telemarketers, (2) the RCPOs Defendants processed for such merchants

---

[104] PX 2 Isaacs ¶ 16.

1 were related to telemarketing transactions, and/or (3) the telemarketers were engaged in
2 fraud or deception.

3 Evidence of knowledge flows from Defendants' own marketing. Their website
4 includes an "Echeck Processing Merchant Application." The application includes check
5 boxes for "Inbound Call Center" and "Outbound Call Center" in a field called "Type of
6 Business."[105] In another section, the application seeks information about the business,
7 including the phone number for inbound call centers and sales or verification scripts for
8 products sold telephonically.[106] Even apart from actively soliciting merchants engaged in
9 outbound and inbound telemarketing, a simple internet search by Defendants would have
10 confirmed that AFB Center, Impetus, and Educare were telemarketers, and that numerous
11 consumers had filed complaints against these companies.[107] For example, online Better
12 Business Bureau reports show that Educare was a telemarketer with more than 100
13 complaints.[108] Moreover, as detailed by the Senior Fraud Mitigation Specialist for Asset
14 Protection at University Federal Credit Union, the nature of the telemarketers' businesses
15 could easily be ascertained by simply calling the telephone number Defendants printed on
16 the RCPOs they created for these merchants.

17 Furthermore, Defendants received numerous "returned check" reports from
18 financial institutions noting that RCPOs generated were returned for reasons such as
19 "stop payment" and "forgery." Indeed, bank records indicate that, during the relevant
20 period, Defendants processed RCPOs for no more than eight to twelve merchants at a
21 time.[109] With such a limited universe, Defendants could readily have determined their
22 clients' business. Finally, that Defendants have taken to lying and misleading numerous
23 financial institutions in order to obtain processing accounts for their clients indicates
24 strongly that they knew or consciously avoided knowing that their clients were engaged
25 in unlawful activity.

26

27

28

---

[105] PX 1 Barker ¶ 65.
[106] *Id.*
[107] PX 4 CSB 10.
[108] PX 1 Barker ¶ 66.
[109] PX 2 Issacs ¶ 17.

3. **Defendants Have Violated the Ohio CSPA**

Ohio's CSPA, R.C. 1345.01 *et seq.*, generally prohibits "suppliers" from engaging in unfair or deceptive acts or practices in connection with "consumer transactions." Defendants are "suppliers" as defined by R.C. 1345.01(C). The language of the CSPA tracks the language of the FTC Act, prohibiting unfair practices. Defendants RCPO payment processing operation violates the CSPA for the same reasons that it is unlawful under the FTC Act. Additionally, CSPA, R.C. 1345.02, prohibits processing debits, including through RCPOs, to Ohio consumers' bank accounts on behalf of telephone solicitors who are not properly registered with the Ohio Attorney General's Office and bonded as required pursuant to the Ohio Telephone Solicitations Sales Act, R.C. 4719.02(A) and 4719.04(A). Defendants' client Educare is not registered or bonded with the Ohio Attorney General's Office.

4. **The Corporate Defendants Are Subject to Joint and Several Liability as a Common Enterprise**

Where, as here, two or more corporations act as a single enterprise in furtherance of a fraudulent scheme, courts have disregarded their corporate identities and treated them as a common enterprise, holding each jointly and severally liable for the unlawful acts and practices of the other. *FTC v. Grant Connect LLC,* 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) (citing *FTC v. Nat'l Urological Group, Inc.,* 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008)), *aff'd in part, rev'd in part on other grounds,* 763 F.3d 1094 (9th Cir. 2014); *see also, Zale Corp. & Corrigan-Republic v. FTC,* 473 F.2d 1317, 1320 (5th Cir. 1973) (The Court held that the "intergrated operation interlocking directorate and unified advertising strongly militate for finding the Enterprise to be the appropriate subject for the Commission's order and for application of the exceptions to recognition of separate corporate entities where to do so frustrates a statutory policy."). When determining whether a common enterprise exists, "the pattern and frame-work of the whole enterprise must be taken into consideration." *Delaware Watch Co. v. FTC,* 332 F.2d 745, 746-47 (2d Cir. 1964) (affirming an order holding a company jointly and severally liable because it was part of a "maze of interrelated companies"). In determining whether several

business entities are operating as a common enterprise, courts look to whether the companies "(1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 637 (6th Cir. 2014). "[E]ntities constitute a common enterprise when they exhibit either vertical or horizontal commonality-qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *FTC v. Network Services Depot, Inc.*, 617 F.3d 1127, 1143 (9th Cir. 2010). As shown in Section II.A, above, Madera and B&P have operated as a common enterprise by sharing control, ownership, employees, websites, and clients; intermingling funds; and executing the RCPO scheme at issue. Thus, each corporations is liable for the total injury caused by the scheme.

### 5. The Individual Defendants Are Personally Liable

An individual defendant is personally liable for injunctive relief if she directly participated in the unlawful acts or had some control over the acts. *FTC v. Publ'g Clearing House*, Inc. 104 F.3d 1168, 1170-71 (9th Cir. 1997); *FTC v. Network Servs. Depot, Inc.*, 617 F.3d at 1138. "Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 573 (7th Cir. 1989). Further, "[a]n individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007) (quoting *FTC v. Windward Mktg., Inc.*, CIV. A. 1:96-CV-615F, 1997 WL 33642380, at *13 (N.D. Ga. Sept. 30, 1997)).

The standard for determining whether an individual is also subject to monetary relief for the unlawful acts of the corporation is whether the individual possessed actual or constructive knowledge of the acts. *Publ'g Clearing House*, 104 F.3d at 1171; *Amy Travel*, 875 F.2d at 573. Constructive knowledge can be shown by demonstrating that the individual was recklessly indifferent to the truth, or had an awareness of a high probability of fraud coupled with an intentional avoidance of the truth. *Publ'g Clearing*

*House*, 104 F.3d at 1171. The FTC is not required to show that the individual intended to defraud consumers to establish individual liability. *Id.*

As shown in Section II.B, above, the Individual Defendants are the officers and owners of the closely held Corporate Defendants through which they execute the scheme at issue. The Individual Defendants control, participate in, and have knowledge of the unlawful acts. They are, therefore, personally liable, jointly and severally, for the total injury caused by their scheme.

### 5. The Equities Tip Decidedly in the Public's Favor

In balancing the equities, "public equities must receive far greater weight." *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028-1029 (7th Cir. 1988), *see also FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. 1981) ("When the Commission demonstrates a likelihood of ultimate success, a countershowing of private equities along would not suffice to justify denial of a preliminary injunction."). The equities test "works on a sliding scale so that the greater the plaintiff's success on the merits, the less harm she must show in relation to the harm defendant will suffer if the preliminary injunction is granted." *FTC v. Lifewatch Inc.*, 15-cv-5781, 2016 U.S. Dist. LEXIS 45057, at *54-55 (N.D. Ill. Mar. 31, 2016) (quoting *Kinney ex rel. NLRB v. Int'l Union of Operating Eng'rs, Local 150*, 994 F.2d 1271, 1277 (7th Cir. 1993)). "[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *FTC v. USA Fin., LLC*, 415 Fed. Appx. 970, 974-75 (11th Cir. 2011). The public interest in this case is compelling—halting unlawful and injurious conduct and preserving assets that may be used for restitution to victims. Defendants, by contrast, have no legitimate interest in continuing their unlawful scheme. *See FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989) ("no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment") (quotation omitted). As the evidence filed herewith demonstrates, Plaintiffs are likely to succeed on the merits, and the equities tip decidedly in the public's favor. Thus, a TRO is warranted.

## C.    The Proposed *Ex Parte* TRO Is Appropriate

Plaintiffs have filed this action to stop Defendants' unlawful acts and practices and to obtain restitution for Defendants' victims. If Defendants receive advance warning of this filing, there is a substantial risk that they will dissipate assets or destroy evidence, which will frustrate the Court's ability to grant the final relief sought. As set forth in Section II.B, the Individuals Defendants are recidivists who engaged in virtually identical unlawful conduct in the past. To continue and further their scheme, Defendants routinely submit false or misleading information to financial institutions, and they provide unlawful telemarketing schemes with a payment method that the law expressly prohibits. In sum, Defendants have continuously demonstrated utter disregard to the law.

To preserve the possibility of effective final relief, including victim restitution, the proposed *ex parte* TRO would: (1) freeze Defendants' assets; (2) appoint a temporary receiver over the Corporate Defendants; (3) grant the temporary receiver immediate access to Defendants' place of business and records; (4) provide the temporary receiver and Plaintiffs with expedited discovery related to Defendants' assets and business records; and (5) provide for an accounting of Defendants' assets.

The Fifth Circuit has upheld the authority of district courts to order an asset freeze to preserve the possibility of consumer redress. *See, Assail*, 410 F.3d at 263 (*ex parte* TRO and preliminary injunction including asset freeze). And district courts in Texas have frozen the assets of defendants in numerous enforcement actions.[110] As Plaintiffs are likely to succeed in showing that the Individual Defendants are personally liable for restitution, the asset freeze should extend to their assets as well. *See CFTC v. Muller*, 570 F.2d 1296, 1301 (5th Cir. 1978). ("Temporary freeze of defendant's assets was reasonably necessary to assure that the court's jurisdiction would not be defeated by the defendant's disposition of assets.").

Appointing a temporary receiver is critical. Where Corporate Defendants and their managers and officers have been engaged in deception and unlawful acts, "it is likely that in the absence of the appointment of a receiver to maintain the *status quo*, the

---

[110] *See supra*, note 4.

corporate assets will be subject to diversion and waste" to the detriment of consumers victimized by the fraud. *SEC v. First Fin. Group*, 645 F.2d 429, 438 (5th Cir. 1981); *see also FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984) (affirming preliminary injunction that imposed an asset freeze and appointed a receiver); *FTC v. USA Beverages, Inc.*, No. 05-CV-61682, 2005 WL 5654219, at *8 (S.D. Fla. Dec. 6, 2005) ("Appointing a receiver for [the corporate defendant] is essential to ensure that [it] complies with the [court's order], and to prevent the destruction of evidence and the concealment or dissipation of assets."). The receiver will help ensure that the Corporate Defendants do not dissipate their ill-gotten gains. The receiver will identify, secure and control the use of the Corporate Defendants' assets, as well as marshal and preserve their records. The receiver may also assist in determining the extent of the fraud and in identifying victims.

### D. Allowing the Temporary Receiver Access to the Woods' Residence, Which is Defendants' Main Place of Business

The Corporate Defendants' main business premise is also the Woods' El Paso home. Given the fraudulent nature of the scheme at issue, it is crucial for the temporary receiver to have immediate access to the property for the limited purpose of securing and taking possession of the Corporate Defendants' business records. As noted in the accompanying Certification of Plaintiff's Counsel in Support of Ex Parte Motion for Temporary Restraining Order Pursuant to Federal Rule of Civil Procedure 65(b), in numerous instances, upon learning of an FTC action, defendants have destroyed evidence, disabled electronic storage devices containing crucial business records, and deleted business records stored on computers and remotely on servers. Providing the receiver with the authority to immediately take possession of all records of the Corporate Defendants will help insure that these vital records are not lost.

Furthermore, in order to fully unravel the tangle of RCPO payment processing accounts and client-merchants involved in this matter and to locate assets related to Defendants' unlawful operation, Plaintiffs respectfully request that this Court permit the receiver and Plaintiffs expedited discovery of Defendants and order financial reporting by

Defendants. District courts are authorized to fashion discovery to meet the needs of particular cases. *See*, Fed. R. Civ. P. 1, 26(d) and 34(b). Any hardship on Defendants caused by the relief sought would be temporary and is greatly outweighed by the public's interest in preserving evidence and assets obtained through Defendants' unlawful practices.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully requests that the Court grant this Motion, issue the proposed TRO, and require Defendants to show cause why a preliminary injunction should not issue against them.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated: July 18, 2019

/s/ *J. Ronald Brooke, Jr.*
J. Ronald Brooke, Jr.
Russell Deitch
Federal Trade Commission
600 Pennsylvania Ave., N.W., CC-8528
Washington, DC 20580
(202) 326-3197 (fax)
rdeitch@ftc.gov
jbrooke@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

Jeffrey Loeser (Ohio Bar #82144)
Erin Leahy (Ohio Bar #69509)
Assistant Attorneys General
Consumer Protection Section
30 E. Broad Street, 14th Floor
Columbus, Ohio 43215
(614) 466-8831
jeff.loeser@OhioAttorneyGeneral.gov
erin.leahy@OhioAttorneyGeneral.gov
(Pending)

Attorneys for Plaintiff
STATE OF OHIO