FILED
2019 JUL 18 PM 3:20
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

Federal Trade Commission, and

State of Ohio ex rel. Attorney General Dave Yost,
    Plaintiffs,

v.

**Madera Merchant Services, LLC,** dba E Check Processing and echeckprocessing.net, a Texas company,

**B&P Enterprises, LLC,** a Texas company,

**Bruce C. Woods,** individually and as an owner, officer, member, and/or manager of Madera Merchant Services, LLC, and B&P Enterprises, LLC,

**Patricia Woods,** individually and as an owner, manager, and/or member of Madera Merchant Services, LLC, and B&P Enterprises, LLC,

and

**Victor Rodriguez,** individually and as an officer, member, and/or manager of Madera Merchant Services, LLC, and B&P Enterprises, LLC,
    Defendants.

CERTIFICATION OF PLAINTIFF FEDERAL TRADE COMMISSION COUNSEL J. RONALD BROOKE, JR., PURSUANT TO FED. R. CIV. P. 65(B)(1) IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER AND MOTION TO SEAL TEMPORARILY THE DOCKET AND ENTIRE FILE

(FILED UNDER SEAL)

    I, J. Ronald Brooke, Jr., hereby declare as follows:

    I am over twenty-one years of age and am a citizen of the United States. I am one of the attorneys representing the Federal Trade Commission ("FTC") in this action against Madera Merchant Services, LLC, B&P Enterprises, LLC, (collectively the Corporate Defendants) and Bruce Woods, Patricia Woods, and Victor Rodriguez (collectively the Individual Defendants).

1

I am a member in good standing of the bar of the State of Maryland (Bar No. 0202280002). My work address is Federal Trade Commission, Division of Marketing Practices, 600 Pennsylvania Avenue, N.W., Mail Stop CC-8528, Washington, D.C. 20580. Unless indicated otherwise, I have personal knowledge of the facts stated herein and if called as a witness, would competently testify thereto.

I submit this certification pursuant to Rule 65(b)(1) of the Federal Rules of Civil Procedure, 28 U.S.C. § 1746, in support of the FTC's *Ex Parte* Motion for a Temporary Restraining Order, Asset Freeze, Other Equitable Relief, an Order to Show Cause Why Preliminary Injunction Should Not Issue, and Memorandum in Support Thereof ("TRO Motion") and in support of the FTC's request that the Temporary Restraining Order ("TRO") be issued without notice to Defendants. I also submit this certification in support of the FTC's *Ex Parte* Motion to Temporarily Seal the Docket and Entire File, filed contemporaneously with the TRO Motion.

Pursuant to Federal Rule of Civil Procedure 65(b)(1), this Court may issue a TRO without notice to Defendants if "(A) specific facts in an affidavit … clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." For the reasons discussed below, the FTC has *not* provided Defendants with notice of the filing of this action or the TRO Motion. The interests of justice require that these filings be heard *ex parte*.

A.  **<u>Defendant's Scheme</u>**

The evidence set forth in the TRO Motion and supporting exhibits, filed concurrently herewith, demonstrates that Defendants have engaged in a multi-million clandestine Remotely Created Payment Order ("RCPO") payment processing scheme that withdraws money from consumers' accounts on behalf of third-party merchants, many of whom are perpetrators of fraud and deceptive scams. To execute their processing scheme, Defendants have opened business checking accounts under various assumed names with numerous local banks and credit unions. They often misrepresent the type of business for which they open the account, and routinely fail to disclose that it will be used to process consumer payments for third-party merchants via RCPOs. High rates of returned checks and other red flags have led many financial institutions to close accounts that Defendants used for their RCPO scheme. When that happens, Defendants open new accounts with different financial institutions. Defendants have opened such accounts at more than 25 banks and credit unions, mostly in Texas and Wisconsin. Their scheme has caused injury to consumers throughout the United States.

The Defendants include a scofflaw, Bruce Woods. In 2008, co-plaintiff, the State of Ohio, sued him and the Corporate Defendants' predecessors – Banctech Processors, Inc. ("Banctech") and Electronic Check Corporation – for unlawfully providing RCPO payment services to Med Provisions, a Canadian telemarketer that had been sued by the FTC for operating a bogus online pharmacy selling sham "membership packages" to elderly consumers. The Ohio court found Bruce Woods and his companies liable for

3

more than $430,000 in restitution and civil penalties, and permanently enjoined them from processing RCPO payments for unlawful telemarketers.

**B.     The Proposed TRO**

The proposed TRO would:  (1) immediately halt Defendants' unlawful acts and practices; (2) freeze the Individual and Corporate Defendants' assets to preserve them for potential restitution to victims; (3) appoint a temporary receiver over the Corporate Defendants; (4) grant the temporary receiver immediate access to the Corporate Defendants' El Paso business premises (Bruce Woods residence) to take possession of the Corporate Defendants' business records; (5) allow for limited expedited discovery; (6) prohibit Defendants from using or selling consumer data obtained during the course of the scam; (7) provide other equitable relief; and (8) require Defendants to show cause why this Court should not issue a preliminary injunction extending such temporary relief pending an adjudication on the merits.

**C.     Reasons Why *Ex Parte* Filing is Necessary**

There is ample evidence that defendants have the motivation and opportunity to conceal and dissipate assets and destroy important documents, as demonstrated by, among other things: (i) the egregious nature of Defendants' scheme, (ii) the Defendant' using a new company (B&P Enterprises) to perpetrate their scheme when the old one was flagged by banks; (iii) the fact that the Defendants have continued to migrate to new banks and credit unions to perpuate their operation even after numerous accounts have been closed by banks and credit unions due to the high number of returned checks and other red flags; (iv) the fact that Bruce Woods has continued to process RCPOs for

4

unlawful telemarketers evn after being sued by the state of Ohio; and (v) prior FTC experience with analogous circumstances of defendants facing financial liability for unlawful business practices, especially telemarketing scams, and the relative ease with which critical electronic evidence can be destroyed and money dissipated.

Moreover, as detailed in Section III of Plaintiffs' Motion for an Ex Parte Temporary Restraining Order and Memorandum in Support Thereof ("TRO Memo"), evidence adduced during the FTC's investigation indicates that the Defendants possess consumer's sensitive information including their bank account information. There is a substantial risk that the Defendants will destroy this evidence of harm to consumers when they have notice of an FTC Action, or they may instead commoditize it for financial gain by selling it to other individuals or companies engaged in deceptive practices. Thus, to prevent either of these problematic situations, the TRO should prohibit the destruction of documents and the sale of consumers' credit card, debit card, or bank account information.

D.  **Relevant Precedent**

It has been the FTC's experience that defendants involved in deceptive acts and practices that receive notice of the filing of an action by the FTC, or of the FTC's intent to file an action, often attempt to undermine the FTC's efforts to preserve the *status quo* by immediately dissipating or concealing assets or destroying documents.

The following examples come from FTC actions where defendants not subject to an *ex parte* TRO hid assets and destroyed documents, and illustrate the FTC's concern that the Defendants in this case would do the same:

5

a. In *FTC v. Connelly*, No. 06-701 (C.D. Cal. 2006), the court, following notice to two of the three individual defendants, issued an *ex parte* TRO with an asset freeze against a third individual defendant. After receiving notice of the TRO, all three defendants withdrew a total of at least $800,000, some of which was subject to the asset freeze, and most of which was never recovered.

b. In *FTC v. Jeremy Johnson, et al.*, Civ. No. 10-2203-MMD-GWF (D. Nev. Mar. 25, 2013), an individual defendant who learned about the FTC's investigation of his company enlisted nominees to create dozens of legal entities used to hold and conceal from authorities millions of dollars in assets, including assets connected to illegal online poker payment processing.

c. In *FTC v. Physicians Healthcare Development, Inc.*, No. 02-02936 (C.D. Cal. 2002), the defendants were given advance notice of a TRO hearing. Prior to the hearing and entry of the TRO, the defendants removed all business records and computer equipment from the business premises, none of which were recovered.

d. In *FTC v. National Consumer Council*, No. 04-0474 (C.D. Cal. 2004), the court granted the FTC's *ex parte* application for a TRO with asset freeze and the appointment of a temporary receiver against all but one of the corporate defendants. One of the individual defendants then deleted key electronic files on defendants' shared network server by

accessing his account through a computer under the control of the corporate defendant that was not under the receivership.

e. In *FTC v. E.M.A. Nationwide Inc.*, No. 12-cv-02394 (N.D. Ohio 2012), the court denied the FTC's request for an *ex parte* TRO with a corporate asset freeze. Within days, the defendants withdrew more than $152,000 from a bank account.

f. In *FTC v. Transcontinental Warranty, Inc.*, No. 09-2927 (N.D. Ill. 2009), the FTC moved for a TRO with notice to the defendants and the court issued it, freezing defendants' assets and appointing a receiver. However, when the receiver and counsel for the FTC arrived at the corporate defendants' premises pursuant to the court's order, hundreds of folders with labels indicating that they contained records of defendants' most recent transactions were found empty. In addition, five computers, including that of the corporate defendants' CFO, were missing – allegedly stolen the night before the arrival of the receiver and counsel for the FTC.

g. In *FTC v. Canada Inc., et al.*, No. 04 C 4694 (N.D. Ill. 2004), Canadian authorities executed a search warrant on the business premises of Canadian defendants. The FTC subsequently filed its complaint and its motion for a TRO with asset freeze, and provided notice to the defendants. The FTC subsequently discovered that the defendants had made several transfers totaling approximately $70,000

7

after receiving notice of the FTC's action. The FTC was unable to recover the $70,000.

h. In *FTC v. Access Resource Services, Inc.*, No. 02-60226 (S.D. Fla. 2002), when an individual defendant became aware of the noticed TRO hearing, he attempted to exploit the Florida homestead exemption by making a $579,600 payment to pay off the mortgage on his residence.

i. In *FTC v. Thomas E. O'Day*, No. 94-1108-CIV-ORL-22 (M.D. Fla. 1994), the district court denied the FTC's request for an *ex parte* TRO with asset freeze and scheduled a noticed hearing on the relief sought. Several days later, the FBI executed a search warrant on defendants' business premises as the FTC served notice of its action and the upcoming hearing. Within hours, an individual defendant withdrew approximately $200,000 from one of his bank accounts.

j. In *FTC v. Applied Telemedia Engineering and Management, Inc., et al.*, No. 91-635 (S.D. Fla. 1991), the defendants were advised, pursuant to an agreement with the FTC, that the FTC had filed its complaint and intended to seek a TRO with an asset freeze from the court. When the FTC's agents went to the defendants' offices to serve process, they observed defendants removing boxes of documents from the premises. The FTC moved for, and received, an *ex parte* TRO the following day.

8

The following examples have been identified within the FTC as incidents in which an *ex parte* order helped remedy or mitigate defendants' attempts to dissipate assets or destroy documents:

    a. In *FTC v. Goldman Schwartz Inc.*, No. 13-cv-00106 (S.D. Tex. 2013), the FTC obtained an *ex parte* TRO with an asset freeze against numerous corporate and individual defendants, including the companies' owner. Within an hour of being served with the TRO, but before the asset freeze had been fully implemented, the owner withdrew approximately $268,000 from a frozen corporate account. Shortly thereafter, the owner sold approximately $160,000 in securities held in a personal trading account. The next day, the owner's wife withdrew another $18,500 from a non-defendant corporation's account that was subject to the asset freeze. Because the court had issued its asset freeze in advance of these actions, the FTC and a court-appointed monitor were able to recover all of the money.

    a. In *FTC v. Group One Networks, Inc.*, No. 8:09-CV-0352-T-26-MAP (M.D. Fla. Feb. 25, 2009) the court granted an FTC's *ex parte* motion for a TRO with an asset freeze, which the FTC served on banks known to hold accounts of defendants. After being served with the order, one of the defendants successfully cashed two $10,000 checks that were installment payments for an

9

undisclosed $50,000 loan. The FTC, however, through expedited asset-related discovery, was able to identify the loan payments and the individual defendant subsequently deposited the $20,000 into a frozen bank account to cure any possible contempt of the asset freeze.

b. In *FTC v. Sameer Lakhany*, No. SACV 12-337 CJC (C.D. Cal. 2012), the day after the court granted the TRO, but before the FTC could effect service, the defendant's employee notified the defendant of the FTC's lawsuit and receivership. The individual defendant proceeded to withdraw $204,000 from corporate bank accounts in violation of the asset freeze. The defendant later stipulated to the contempt, and the majority of the withdrawn funds was recovered.

c. In *FTC v. Data Medical Capital, Inc.*, No. 99-1266 (C.D. Cal. 2009), the Commission moved for civil contempt and obtained an *ex parte* TRO and asset freeze. When one of the defendants learned the Commission was investigating his possibly contemptuous actions, he transferred approximately $1 million to a new personal bank account prior to the Commission's filing. While the receiver appointed pursuant to the *ex parte* TRO traced these assets, found the new account, and returned the funds to the

receivership estate, the receivership estate was still diminished by the fees accrued by the receiver's efforts to retrieve the funds.

d. In *FTC v. Prime Legal Plans LLC*, No. 12-cv-61872 (S.D. Fla. 2012), upon hearing of the *ex parte* TRO including an asset freeze, the Defendants transferred $1.7 million in assets to a girlfriend and a mother. The bank was able to recover most of it, but approximately $200,000 was not returned.

e. In *FTC v. Asia Pacific Telecom, Inc. et al.*, No. 10-cv-3168 (N.D. Ill. 2010), the FTC obtained an *ex parte* TRO freezing the defendants' assets and prohibiting them from destroying documents. After being served with the TRO, one of the individual defendants, Hans Smit, deleted an email account used to conduct many of the illegal practices at issue in the FTC's complaint. Smit took this step despite being served with a discovery request by the FTC for documents in the account and despite multiple demands from the court-appointed receiver for access to the account. The court ultimately held Smit in contempt for deleting the account in violation of the TRO.

f. In *FTC v. Fereidoun "Fred" Khalilian*, No. 10-21788 (S.D. Fla. 2010), the Commission sought and obtained an *ex parte* TRO with an asset freeze. Before the banks in which the defendants held accounts could put in place the freeze, one of the individual

defendant's employees withdrew large amounts of money from the company's bank accounts. The individual eventually returned some – but not all – of this money. Additionally, the individual defendant, under cover of darkness, attempted to remove assets located in his personal residence.

g. In *FTC v. American Entertainment Distributors, Inc.*, No. 04-22431 (S.D. Fla. 2004), the court entered an asset freeze that froze assets of both corporate and individual defendants. Within hours of receiving notice of the asset freeze, one of the individual defendants withdrew $39,500 from his bank. Because he violated the terms of the asset freeze, the FTC was able to compel the individual defendant to return the money.

h. In *FTC v. Assail Inc.*, No. 03-007 (W.D. Tex. 2003), the court issued an *ex parte* TRO, including an asset freeze. The lead defendant nonetheless transferred $200,000 after being served with the TRO. Following contempt proceedings and a lengthy appeal, the defendant repaid the transferred funds.

i. In *FTC v. Hanson Publications, Inc.*, No. 02-2205 (N.D. Ohio 2002), Canadian defendants transferred $105,000 from a U.S. account to a Canadian account within two days of receiving service of the TRO with asset freeze. This money was later returned as a predicate to the release of attorney's fees.

12

j.  In *FTC v. SkyBiz.com, Inc.*, No. 01-396 (N.D. Okla. 2001), within days of the service of the TRO with an asset freeze provision, one of the primary defendants convinced an overseas trustee to withdraw $1,000,000 from the offshore account of a foreign affiliate. Because a domestic correspondent bank had been served with the TRO, it refused to transfer the funds. The money in the offshore account was preserved, and ultimately used to provide consumer redress.

In the FTC's experience, defendants may also learn about a case against them from a docket monitoring service. For example, in *FTC v. Wazzu Corp., et al.*, SAV CV 99-762 (S.D. Cal. 1999), when FTC staff arrived at defendants' business premises to serve a temporary restraining order, it learned that defendants had already learned about the action against them from a monitoring service to which their counsel subscribed. The monitoring service would not have learned of the action at the time of filing if the file and docket had been temporarily sealed.

For the above reasons, as contemplated by Fed. R. Civ. P. 65(b)(1), there is good cause to believe that immediate and irreparable damage will result to consumers, including the destruction of Defendants' records and the dissipation or concealment of assets, if Defendants receive advance notice of the FTC's application for a TRO. Thus, it is in the interests of justice that this Court grant such application without notice.

For the same reasons, there is good cause to believe that immediate and irreparable harm will result to consumers if any of the Defendants receive premature

13

notice of the filing of this action.  Thus, the interests of justice would be served if the Court grants the Commission's Emergency *Ex Parte* Motion to Temporarily Seal the Docket and Entire File.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed on July 17, 2019 in Washington, D.C.

/s/ _____
J. Ronald Brooke, Jr.
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-3484 / jbrooke@ftc.gov
Attorney for Plaintiff
FEDERAL TRADE COMMISSION

14